**UNITED STATES**

**v.**

**Alan N. SCOTT**

**No. Cr.A. 99–10099–WGY.**

United States District Court,
D. Massachusetts.

Jan. 18, 2000.

Kevin J. O'Dea, Dennis J. Kelly, Burns & Levinson, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. *Introduction.*

The defendant, Alan N. Scott ("Scott"), here moves to suppress the fruits of two search warrants issued by Magistrate Judge Marianne Bowler. The first warrant issued on March 12, 1999, and was executed on March 16, 1999. The second warrant issued on April 8, 1999, authorizing the government to search the hard drives of two computers seized during the execution of the first warrant. Scott also moves to suppress the contents of his wallet seized by a Secret Service agent on March 16, 1999. Scott argues that the fruits of these two searches should be suppressed because: (a) the initial search warrant issued was not supported by probable cause; (b) the seizure of the computers was illegal due to the absence of probable cause; (c) the search warrants were lacking in particularity; (d) the government so exceeded the scope of the search warrants during their execution that suppression should be mandatory; (e) the search and seizure of the wallet was not a valid search incident to arrest; (f) the government agents failed to comply with Rule 41(d) of the Federal Rules of Criminal Procedure and Scott was prejudiced thereby; and (g) the warrant execution was devoid of the "Good Faith" requirement necessary to invoke *United States v. Leon.* The government filed a response in opposition to Scott's motion to suppress, and Scott filed a reply to the government's opposition. The parties jointly agreed to submit the matter upon the written record without the necessity for an evidentiary hearing.

### II. *Factual Background.*

Mark W. Pearlstein, John M. Hodgens, Jr., U.S. Attorneys Office, Boston, MA, for Plaintiff.

Based on information provided by two confidential witnesses and long-time childhood friends, James Kent ("Kent") and

Michael Jackson ("Jackson"), Special Agent Mark Graham ("Graham") of the United States Secret Service submitted a thirty-three page affidavit on March 12, 1999 to Magistrate Judge Bowler. The affidavit summarized a bank fraud scheme alleged to have been undertaken by Scott, Robert Chace, Jr. ("Chace"), Kent, and Jackson. (Def.'s Mot. to Suppress at 2.) Further, the affidavit alleged that Kent and Jackson were involved with Scott and Chace in obtaining "Rhode Island identification cards in false names," (*id.* at 3), and stated that Kent and Jackson "were further instructed to obtain Shaw's supermarket cards, AAA cards and ATM cards, along with opening maildrops in the false names." (*Id.*) Moreover, the affidavit recounted information given to Graham by Kent and Jackson regarding two automobile loans secured from BankBoston, as well as other actions taken by the informants. Finally, the affidavit sought the issuance of arrest warrants for Scott and Chace and a search warrant for the premises of 15½ Mason Street, Hyde Park, Massachusetts. The warrants were issued on March 12, 1999, and were executed on March 16, 1999.

On March 16, 1999, Federal agents arrested Scott at his residence, 15½ Mason Street, Hyde Park, Massachusetts upon a complaint charging "Scott with making a counterfeit security, in violation of 18 U.S.C. § 513(a); producing a false identification document, in violation of 18 U.S.C. § 1028(a)(1); bank fraud, in violation of 18 U.S.C. § 1344; preventing communication to law enforcement, in violation of 18 U.S.C. § 1512(b); and conspiracy, in violation of 18 U.S.C. § 371." (Gov't Resp. Opp'n at 2.) The Federal agents then executed the search warrant and seized numerous items. Among the items seized were two computers, a Compaq Presario 4660 and an IBM Thinkpad. (Def.'s Mot. to Suppress at 6.) Scott alleges that despite his request, the "executing agents refused to show or give [him] a copy of either the search warrant or arrest warrant, although [he] was arrested and taken away from the premises by Agent Graham." (*Id.*) Further, Scott alleges that "[t]he executing agents also did not leave a copy of the search warrant at the premises, although a copy of the inventory was left at 15½ Mason Street." (*Id.*) An inventory of the items seized was duly filed with the Court.

On April 8, 1999, Graham submitted an additional affidavit to Magistrate Judge Bowler seeking an additional search warrant for the 15½ Mason Street address. The search warrant authorized the Federal agents to search the hard drives of the two computers seized in the initial search for evidence of additional federal offenses. These offenses were: "[m]aking false claims against the United States, in violation of 18 U.S.C. § 287; and wire fraud, in violation of 18 U.S.C. § 1343." (Gov't Resp. Opp'n at 2.)

III. *Analysis.*

In *Illinois v. Gates*, the Supreme Court held that " '[A] magistrate's determination of probable cause should be paid great deference by reviewing courts.' " *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 [1969]); *see also United States v. Feliz*, 182 F.3d 82, 86 (1st Cir.1999); *United States v. Procopio*, 88 F.3d 21, 25 (1st Cir.1996). As the Supreme Court described:

> [T]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238, 103 S.Ct. 2317.

Likewise, the First Circuit has adopted a totality of the circumstances approach and held that "[i]n order to establish prob-

able cause, the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." *Feliz,* 182 F.3d at 86 (quoting *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 [1983] ); *see also United States v. Vigeant,* 176 F.3d 565, 569 (1st Cir.1999); *United States v. Khounsavanh,* 113 F.3d 279, 283 (1st Cir.1997). Moreover, the "probable cause standard does not demand showing that such a belief be correct or more likely true than false." *Feliz,* 182 F.3d at 86 (internal quotation omitted).

■ Although magistrates are given great deference by reviewing courts, finding probable cause to support a search warrant cannot be based on "bare bones" affidavits consisting solely of conclusory statements. Furthermore, " '[m]ere suspicion, rumor, or strong reason to suspect [wrongdoing]' are not sufficient." *Vigeant,* 176 F.3d at 569 (quoting *United States v. Han,* 74 F.3d 537, 541 [4th Cir.1996] ). In *Gates,* the Supreme Court affirmed that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his actions cannot be a mere ratification of the bare conclusions of others." *Gates,* 462 U.S. at 239, 103 S.Ct. 2317.

A. Sufficient Probable Cause for the Initial Search Warrant.

■ Scott argues that Agent Graham's affidavit was not sufficient on its face to support the search of 15½ Mason Street. Specifically, Scott argues that the information in Graham's affidavit was provided by two unknown and unreliable informants and that such corroboration as was undertaken verified only details of their own illegal activities and not the activities of Scott. Further, Scott argues that law enforcement officials failed to corroborate any details of the alleged criminal activity provided by the informants which established ties to Scott. Moreover, Scott argues that the corroborated information relevant to him is the type of innocent detail that does not give rise to probable cause for a search warrant. Finally, Scott argues that the affidavit lacks mention of the "lengthy" criminal records of Kent and Jackson.

In *United States v. Zayas–Diaz,* the First Circuit held that "[f]or evidence to avert suppression ..., normally the warrant application must demonstrate probable cause to believe that a particular person has committed a crime—'the commission element'—and that enumerated evidence relevant to the probable criminality likely is located at the place to be searched—'the nexus element.' " *United States v. Zayas–Diaz,* 95 F.3d 105, 110–111 (1st Cir.1996) (quoting *United States v. Fuccillo,* 808 F.2d 173, 175 [1st Cir.1987] ); *see also Feliz,* 182 F.3d at 86; *Vigeant,* 176 F.3d at 569. Some of the factors which the First Circuit has held will contribute to a probable cause determination are: "whether [the] informant['s] statements are self-authenticating ..., whether some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance), and whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience and expertise." *Zayas–Diaz,* 95 F.3d at 111; *see also Khounsavanh,* 113 F.3d at 284.

Since probable cause is a fact-specific inquiry with no one factor possessing "talismanic powers," *Khounsavanh,* 113 F.3d at 285, it is the sum of all relevant factors that will determine probable cause. Indeed, "[n]one of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." *Zayas–Diaz,* 95 F.3d at 111.

1. Reliability of Kent and Jackson in the Past.

It is well understood that providing accurate information to law enforcement offi-

cials in the past is a strong indicia of an informant's reliability. According to Agent Graham's affidavit in support of the search warrant, neither Kent nor Jackson provided information to Graham in the past. (Def.'s Ex. A ¶ 14.) Kent, nonetheless, had provided information within the past year to other law enforcement personnel in connection with marijuana distribution unrelated to the current investigation. (*Id.*) This information was corroborated, but no arrests were made. Jackson, however, has not provided past information to any law enforcement personnel.

2. Information Provided by Kent and Jackson and Corroborated by Law Enforcement Personnel.

In *Khounsavanh*, the First Circuit decreed:

[T]he judgment to be made is: when does verification of part of the informant's story make it sufficiently likely that the crucial part of the informant's story (i.e., allegations that criminal activity has occurred and that evidence pertaining thereto will be found in the location to be searched) is true, such as would " 'warrant a [person] of reasonable caution and belief' that [a search would be] appropriate," based upon what the informant has said?

*Khounsavanh*, 113 F.3d at 284.

Law enforcement personnel confirmed Kent's description of the exterior of the house located at 15½ Mason Street. (Def.'s Ex. A ¶ 18.) Pretrial Services Officer Alan Chipman ("Chipman") confirmed that Scott resided at 15½ Mason Street, was confined to his home under electronic monitoring, and lived alone. (*Id.* ¶ 20.) Chipman also confirmed that Kent's description of the first floor plan of Scott's residence was accurate. (*Id.* ¶ 22.) Law enforcement personnel confirmed, through Boston Edison, that the electric bill for 15½ Mason Street is in Scott's name, and confirmed that P.O. Box 366236, Hyde Park, Massachusetts is assigned to Scott. (*Id.* ¶ 21.)

Kent reported to Graham that Scott had instructed him to obtain Rhode Island identifications with Jackson because Rhode Island did not produce ID cards through a digitized process. (*Id.* ¶ 24.) Graham confirmed that in 1995–1996, the Massachusetts Registry of Motor Vehicles employed a digital photograph computerized system for the production of identification documents, but the Rhode Island identification system was antiquated and more vulnerable to imposters. (Def.'s Ex. A ¶ 24.)

Kent reported to Graham that he had assumed the identities of Kevin Burke, Brian S. Connelly, and Gerardo Madrigal since November 1998, and he provided Graham with a photocopy of Rhode Island identification cards in the name of Brian S. Connelly, issued on February 1, 1999, and Gerardo Madrigal, issued on December 18, 1998. (*Id.* ¶ 25.)

Kent described to law enforcement personnel how he "purchased" an automobile from Peter Caradonna in the name of Kevin E. Burke, applied for a loan from Bank-Boston, and obtained a $17,500 check made payable to Peter Caradonna. Documentation from the loan file at BankBoston indicated that on or about January 25, 1999, BankBoston issued a $17,500 loan proceeds check made payable to Peter Caradonna. (*Id.* ¶ 31.) Further, the vehicle purchased was reported to be garaged at 15 Evergreen Drive, East Providence, Rhode Island—the address that appears on the Kevin E. Burke Rhode Island ID card with Kent's picture. (*Id.*)

Law enforcement officials confirmed Jackson's description of Chace's car. (*Id.* ¶ 38.) Jackson reported that Scott gave him and Kent lists of different Motor Vehicle Registry locations, names, addresses and maps reflecting the locations, and the money to obtain the identification cards. Jackson provided Graham with "what appears to me [Graham] to be" a computer-generated list of detailed instructions and directions of the locations that should be visited by Kent and Jackson. (Def.'s Ex.

A ¶ 39.) The instructions included the "assumed names, the locations where and the names under which the bank accounts should be opened, the accounts that should be selected, and the amounts to be deposited in the accounts ($50), as well as the specific ATM card that should be chosen ('Select card instead of regular ATM')." (*Id.*)

Jackson reported that he obtained a Rhode Island identification card in the name of David LaPlant at the instruction of Scott. This ID card was obtained by Braintree police, and the Braintree police disclosed that the ID card was issued on December 14, 1998. (*Id.* ¶ 40.) A photocopy of the AAA and Shaw's cards obtained by Jackson, allegedly at the instruction of Scott, were seized by law enforcement officials after Jackson was arrested by Braintree police at Kay Jewelers. (*Id.* ¶ 26.) Kay Jewelers confirmed that Jackson applied for store credit in the name of David A. LaPlante, 900 Post Road, Warwick, RI 02888. (*Id.* ¶ 45.) Braintree police confirmed that Jackson was arrested on December 22, 1998, for attempting to purchase a diamond ring at Kay Jewelers with a fraudulent ID. (Def.'s Ex. A ¶ 45.)

Jackson reported that he received a check for $18,000 from BankBoston to purchase "Madrigal's" car. He further reported that a BankBoston branch divided the $18,000 check into two $9,000 checks. "Records of BankBoston confirm that the $18,000 cashier's check was exchanged for two $9,000 cashier checks at a BankBoston branch in Canton, MA, at approximately 11:37(AM) on December 22, 1998." (*Id.* ¶ 42.) The "real" David A. Laplante was contacted by BankBoston, and he gave an affidavit denying that he was the loan applicant, denying that he received any benefit from the transaction, and claimed the endorsement of the $18,000 check was a forgery. (*Id.* ¶ 43.)

Photocopies of Bank Boston's loan file corroborate that on December 15, 1998, (one day after the LaPlant Rhode Island ID was issued) a telephone request from a "David A. LaPlante" for $18,000 to buy a Mercedes was received. LaPlante gave his address as 900 Post Road, Warwick, Rhode Island. (*Id.* ¶ 47.) An employee at BankBoston's Emerald Square location became suspicious of LaPlante's attempt to cash the $18,000 check and refused to do so without ID. (*Id.*) Subsequently, LaPlante went to a BankBoston branch located within a Stop & Shop Supermarket in Kingston, Massachusetts and received the $18,000 check. (Def.'s Ex. A ¶ 49.) Finally, BankBoston loan records confirmed that an individual who identified himself as "LaPlante" obtained two $9,000 cashier's checks from the BankBoston branch in Canton, Massachusetts in exchange for the $18,000 check.

3. Inculpatory Statements Made by Kent and Jackson and Cross Corroboration of their Accounts.

In *Schaefer*, the First Circuit noted that "[t]he fact that an informant's statements are against his or her penal interest adds credibility to the informant's report." *United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir.1996). The first twenty-seven pages of Graham's affidavit concern Kent and Jackson's inculpatory account of their illegal activities, allegedly at the behest of Scott.[1]

The First Circuit also stated that "[c]ourts often have held that consistency between the reports of two independent informants helps to validate both accounts." *Id.* Kent and Jackson, who grew up together and have been friends for a long time, (Def. Ex. A ¶ 16), met with Graham individually and provided cross corroborating accounts of their illegal activities.

---

1. According to Graham's affidavit, (Def.'s Ex. A ¶ 15), Kent was still involved in the illegal activities as of the writing of the affidavit, but

Jackson's involvement ceased after he was arrested by Braintree police on December 22, 1998.

4. Prior Criminal Histories of Kent and Jackson.

In *United States v. Rumney*, the First Circuit determined that "[a] criminal record, no matter how lengthy, does not necessarily impugn one's veracity." *United States v. Rumney*, 867 F.2d 714, 720–721 (1st Cir.1989). Kent has at least one sealed juvenile case on file. (Def.'s Ex. J.) Since 1993, Kent has been arraigned eleven times for various offenses. (*Id.*) These offenses include seven larcenies by check, larceny, operating after a suspended license, trespassing, and one unreadable offense. (*Id.*)

Since 1991, Jackson has been arraigned thirty three times for various offenses. These offenses include operating after a suspended license three times, forgery, attempting to commit a crime, threatening offenses three times, leaving the scene of property damage two times, operating after a suspended registration, assault and battery with a dangerous weapon, two assault and battery charges, two assaults with a dangerous weapon, possession of marijuana, disorderly person, and fifteen unreadable offenses. (Def.'s Ex. K.)

5. Summary.

Based on the totality of the circumstances, it was not unreasonable for Magistrate Judge Bowler to have formed a commonsense belief that evidence of a crime would be found at 15½ Mason Street. Without considering the information provided by Jackson,[2] the information provided by Kent is sufficient to support a magistrate "of reasonable caution" in finding probable cause. Kent's description of Scott's physical characteristics and description of the first floor of Scott's residence were corroborated by law enforcement officials. In addition, all of Kent's information stemmed from his own personal observation and direct contact with Scott.

The First Circuit in *Khounsavanh* stated that "it is not particularly probative for the informant to supply a lot of details about irrelevant facts that other people could easily know about and that are not incriminating ... [u]nless such details, combined with other circumstances, would in some way generate suspicion that criminal conduct has occurred or that contraband or evidence exists on the premises...." *Khounsavanh*, 113 F.3d at 284. In *United States v. Taylor*, however, the court stated "the affidavit may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's first-hand description of the place to be searched...." *United States v. Taylor*, 985 F.2d 3, 6 (1st Cir.1993). Therefore, Kent's personal observation and direct contact with Scott, coupled with his detailed description of Scott's residence and his description of the schemes allegedly masterminded by Scott, is enough to generate the necessary suspicion that criminal conduct occurred at 15½ Mason Street. Further, the information provided by Kent and corroborated by law enforcement officials is remarkably similar to the information found sufficient to authorize a search warrant in *United States v. Kessinger*, 504 F.Supp. 494, 497, 499 (D.Mass. 1980) (Caffrey, C.J.).[3]

---

**2.** It is questionable whether Jackson is a satisfactorily reliable informant. Unlike Kent, Jackson has not provided law enforcement officials with information in the past. In addition, Jackson's criminal record includes forgery which seriously undermines his credibility. Although the Court in *Rumney* held that a criminal record does not per se impugn one's veracity, the Court suggested that crimes similar to perjury or false statements could discredit trustworthiness. *See Rumney*, 867 F.2d at 720 ("appellant does not contend that Nas-

soura's crimes were ones involving perjury or false statements"). Regardless, the information provided by Kent is sufficient to establish probable cause for the search warrant.

**3.** In *United States v. Kessinger*, the Court found the informant reliable based upon the informant's personal observation of Kessinger possessing cocaine in his apartment and the informant's description of the defendant, his cars, and his apartment. *Id.* at 499. The Court determined that this information was of

■ Probable cause is further supported by law enforcement's knowledge of Scott's lengthy criminal record.[4] "An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination." *Taylor*, 985 F.2d at 6. Moreover, probable cause is supported by Graham's experience as a Special Agent for the Secret Service, United States Department of the Treasury.[5] "[T]he issuing magistrate properly may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi." *Id.*

B. Sufficient Probable Cause to Seize Computer Equipment.

■ The computers were seized pursuant to the affidavit requesting seizure of property that constituted evidence of criminal offenses, the fruits of crime, and the instrumentalities of criminal offenses. Specifically, the crime in question is a violation of 18 U.S.C. § 513(a) which prohibits "mak[ing], utter[ing] or possess[ing] a counterfeited security of . . . an organization . . ., with intent to deceive another person, organization or government. . . ." The statutory definition of a security includes a "check." *See* 18 U.S.C. § 513(c)(3). Further, the statutory definition of "organization" is any "legal entity,

other than a government, established or organized for any purpose, and includes a corporation, company . . . or any other association of persons which operates in or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 513(c)(4).

Scott argues that Graham's affidavit fails to describe any offense that falls within the scope of 18 U.S.C. § 513(a), and its inclusion in the affidavit is a pretext by the government to accomplish an otherwise unlawful seizure of computer equipment. Scott also argues that the supporting affidavit failed to establish a sufficient nexus to support the seizure of the computer equipment and thus the seizure was just part of a "fishing expedition" by the government to obtain information for the Internal Revenue Service.[6]

Since the decision of the neutral magistrate need only be supported by a commonsense belief that there is a fair probability of contraband or evidence of a crime present at the place to be searched, *Feliz*, 182 F.3d at 86, this Court rules that the affidavit contains sufficient information to establish probable cause for seizing the computers. Kent reported to Graham that he personally saw Scott produce checks from his computer. (Def.'s Ex. A ¶ 33). Kent also reported that he had (1) witnessed the software used to produce these

a sufficiently detailed nature "so as to assure that it was based on more than mere rumor or speculation." *Id.* Also noteworthy is the fact that probable cause was found in *Kessinger* applying the *Aguilar–Spinelli* two-prong test, a notably stricter standard than the totality of the circumstances standard adopted in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

4. According to Graham's affidavit, Scott has been convicted of possessing a firearm without a permit, twice convicted of counterfeiting motor vehicle documents, and threatening and intimidating a material witness. (Def.'s Ex. A ¶ 4.) Further, Scott has two pending criminal charges against him. These charges are for bank fraud and conspiracy to make false claims against the United States Treasury. (*See id.* ¶¶ 6–8.)

5. According to his affidavit, Graham has investigated offenses involving *inter alia* credit card fraud, bank fraud, and fraudulent negotiation of U.S. Treasury checks for the past eight years. (Def.'s Ex. A ¶ 1.)

6. Scott argues that the seizure of the computer equipment was designed to aid IRS Agents James Donahue ("Donahue") and Michael Gianoukos ("Gianoukos") in their two criminal cases against Scott pending before Judge O'Toole. As support for his position, Scott notes the "virtually identical" nature of computer seizure sections of Graham's affidavit and Gianoukos' affidavit in support of a November 1997 search of Scott's residence. (Def.'s Mot. to Suppress at 13.)

checks,[7] (2) seen reams of blank check stock,[8] and (3) personally signed checks in the name of Kevin Burke and Mark Zowella (phonetic) at Scott's instruction. (*Id.*) In addition, Kent reported that he signed several dozens of these checks made payable to various retail stores in amounts ranging from $15–$500. (*Id.*)

Kent's forging of checks produced by Scott from his computer and payable to various retail stores alone may not be sufficient to establish a violation of 18 U.S.C. § 513(a). In *United States v. Barone,* the Ninth Circuit concluded that "an entity can only constitute an 'organization' for purposes of § 513 if its activities—apart from the uttering of its forged securities—affect interstate commerce." *United States v. Barone,* 71 F.3d 1442, 1446 (9th Cir.1995).

The Court need not resolve the issue at this juncture, however, since the alleged forged securities activity, in conjunction with the alleged violation of 18 U.S.C. § 1344,[9] is sufficient to support a finding of probable cause to seize the computers. Unlike the "shell" company in *Barone,* the Scott–Kent association engaged in crimes beyond the mere forging of checks. Kent reported to Graham that he (Kent), acting as Kevin E. Burke (a name which Kent allegedly used to sign forged checks produced from Scott's computer), " 'purchased' an automobile ostensibly owned by Peter Caradonna, applied for a loan from BankBoston, a bank with deposits insured by the Federal Deposit Insurance Corporation, and obtained a $17,500 check made payable to Peter Caradonna." (Def.'s Ex. A ¶ 30.) Kent then reported to Graham that he received $1,000 for acting as the "purchaser" and the remaining proceeds were divided between Scott, Chace, and the "seller." The $17,500 loan check made payable to Peter Caradonna was confirmed by documentation from the loan file of BankBoston. The vehicle was identified as a 1996 Nissan Pathfinder and "was reported to be garaged at 15 Evergreen Drive, East Providence, Rhode Island, which is the address that appears on the Kevin E. Burke Rhode Island ID card that depicts a photograph of [Kent]." (*Id.* at ¶ 31.)

The alleged checks forged by Kent in the name of Kevin Burke and produced on Scott's computer, in conjunction with Kent's posing as Kevin Burke and committing bank fraud against BankBoston, creates a sufficient nexus to warrant a person

---

7. Scott argues that this statement necessarily implies that the software was not installed on the computer, but instead was on a separate disk or CD–ROM. (Def.'s Mot. to Suppress at 12.) Scott also argues that one cannot "see" software that has been installed on the hard drive of a computer, and the Agents therefore had no basis for searching the computer when the software existed as a separate disk or CD–ROM. (*Id.*) Moreover, Scott argues that the seizure of the computers was improper because the government's analysis of the seized computers revealed no such software and the only software seized were Versacheck software disks in their original unopened packages. (*Id.* at n. 2.)

This argument is unpersuasive for two reasons. First, software can often be "seen" on the hard drive of a computer through its corresponding icon. Second, allegedly seeing the software is only part of the evidence to support probable cause for seizing the computers and even without this piece, there is still sufficient information contained in Graham's affidavit to establish probable cause.

8. Scott argues that photographs taken by the Secret Service did not reveal reams of blank check stock, but instead only reams of copy paper. (Def.'s Reply Mem. at 3–4 n. 1.) Further, the government was only able to seize a small packet of check paper. (*Id.*) This is irrelevant, however, to whether the magistrate had sufficient probable cause to issue a search warrant. The standard for probable cause is not the actual presence of evidence, but the commonsense belief in the fair probability that evidence or contraband will be found. *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

9. Section 1344 defines bank fraud as:

"knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice . . .
(2) to obtain any of the moneys [or] funds . . . owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises."

of reasonable caution to make a common-sense determination that evidence of crimes involving a "Kevin Burke" might be found on Scott's computer. Similar to the First Circuit's determination in *Feliz* that it is reasonable to suppose a drug trafficker "possessed documents showing the names and telephone numbers of customers and suppliers" at his residence, *Feliz*, 182 F.3d at 87, this Court rules that it is equally reasonable to suppose that someone allegedly engaged in bank fraud and producing false securities on his computer would have records of the bank fraud and false securities on that computer.

■ Graham's April 8, 1999 affidavit likewise contains sufficient information to support probable cause to search the hard drives of the Compaq Presario CPU 4660 computer and IBM Thinkpad computer seized during the execution of the March 16, 1999 search of Scott's residence. The search warrant sought evidence of two offenses. These offenses are a violation of 18 U.S.C. § 287 and a violation of 18 U.S.C. § 1343.[10]

According to Graham's April 8, 1999 affidavit, Special Agent Rittenour ("Rittenour") was able to conduct a "text string" mirror-image search of the computers' hard drives. (Def.'s Ex. D ¶ 7.) After querying the search for "hits" associated with names involved in Graham's original affidavit, Rittenour obtained hits for the names Caradonna and Burke. (*Id.*)

The name Caradonna was used in the fraudulent $17,500 loan obtained from BankBoston, and Rittenour detected a hit for Caradonna on the hard drive of the Compaq Presario. (*Id.* ¶ 9.) The hit corresponded to an e-mail message sent on January 28, 1999 from the computer seized in the initial search and "made reference to an application for purchase of $17,500 of the Reserve Primary fund." (*Id.*) The account at Reserve Funds in the name of Peter Caradonna was confirmed by Justus Sackett at Reserve Funds in New York, and Sackett confirmed that an e-mail message was sent to Reserve Funds on January 28, 1999. (*Id.* ¶ 10–11.)

Rittenour also detected numerous hits for the name Kevin Burke. The hits contained different social security numbers and address information for various "real" Kevin Burkes. (Def.'s Ex. D ¶ 13.) Although none of this information identically matched the Kevin Burke involved in the bank fraud, Graham extrapolated from the BankBoston loan application and the information on the Compaq Presario that the "Kevin Burke" involved in the bank scheme was created by mixing and matching information concerning various "real" Kevin Burkes. (*Id.* ¶¶ 14–16.)

In addition, Rittenour found the name Kevin Burke with references to tax information.[11] On April 2, 1999, Graham and Special Agent Gianoukos visited the first "real" Kevin Burke whose social security and address information was found on the Compaq Presario. The "real" Kevin Burke knew nothing about the $17,500 loan, did not know Scott or Peter Caradonna, had not yet filed his tax return, and did not request that a refund of $3,149 be electronically deposited to a Chase Man-

---

**10.** Section 287 states, "[w]hoever makes or presents to any person or officer in the civil ... service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious or fraudulent, shall be imprisoned...."

Section 1343 states, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money by means of false or fraudulent pretenses ... transmits ... by means of wire, radio or television communication in interstate ... commerce, any writings ... for the purpose of executing such scheme or artifice, shall be fined ... or imprisoned...."

**11.** Graham provided Special Agent Gianoukos with the different names, dates of birth, and social security numbers of the Kevin Burkes found on the Compaq Presario. Gianoukos later informed Graham that these Kevin Burkes had filed tax returns and had received refunds electronically mailed to different accounts.

hattan Bank account. (*Id.* ¶ 18.) Graham and Gianoukos then interviewed the father of Kevin A. Burke (real Kevin Burke # 2) and were told that he has "no knowledge of his son ever owning a Nissan Pathfinder...." (*Id.* ¶ 19.) Finally, Graham and Gianoukos attempted to visit a third "real" Kevin Burke and learned that he did not reside at the given address. They did learn, however, that he had not filed a tax return and did not know Scott. (*Id.* ¶ 20.) No one could be reached at the address of the fourth "real" Kevin Burke obtained from a search of the Compaq Presario.

The information obtained in the mirror-image text string search coupled with Graham's subsequent interviews with "real" Kevin Burkes, as well as with Gianoukos' knowledge of Scott's modus operandi and Scott's prior criminal record, provides sufficient evidence to establish probable cause to search the hard drives of the two computers.

### C. The Particularity of the Search Warrants.

Scott argues that the search warrants issued on March 12 and April 8, 1999 were both prohibited general warrants. Specifically, Scott argues that the warrants gave only generic characterizations of the documents sought, authorized the seizure of items far exceeding the scope of the criminal activity described in the affidavit and did not limit the scope of the seizure to a time frame consistent with the stated criminal scheme.

■ The Fourth Amendment's requirement that a warrant describe with particularity the place to be searched and the things to be seized "arises out of the hostility to the Crown's practice of issuing 'general warrants' taken to authorize the wholesale rummaging through a person's

property in search of contraband or evidence." *United States v. Upham*, 168 F.3d 532, 535 (1st Cir.1999); *see also Fuccillo*, 808 F.2d at 175. Indeed, "[t]he requirement that warrants shall particularly describe the things to be seized ... prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir.1980); *see also Fuccillo*, 808 F.2d at 175. Further, a particular warrant "inform[s] the person subject to the search and seizure what the officers are entitled to take." *In re Lafayette Academy*, 610 F.2d 1, 5 (1st Cir.1979).

1. Search Warrants Gave Generic Characterizations of the Documents Sought and Authorized the Seizure of Items Exceeding the Criminal Activity Described in the Affidavits.

■ Scott argues that even though the affidavits set forth specific names and entities that were allegedly used in conjunction with the suspected criminal activity, the search warrants made no attempt to confine the objects of the search to those specific names and entities. Further, Scott argues that the search warrants authorized the seizure of items beyond those for which the affidavits established probable cause.

The Court must determine whether the list of items to be seized attached to the search warrant is stated with the appropriate particularity.[12] "The cases on 'particularity' are actually concerned with at least two rather different problems: one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take ... and the other is whether the category as specified is too broad in the sense that it in-

---

12. Scott argues that the search warrants did not incorporate or otherwise make any reference to the affidavits nor was the affidavit attached to the search warrant. (Gov't Exs. 2, 4.) In *United States v. Klein*, the First Circuit recognized that an affidavit may provide the necessary particularity if "the affidavit accompanies the warrant, and the warrant uses suitable words of reference which incorporate the affidavit." *United States v. Klein*, 565 F.2d 183, 186 n. 3 (1st Cir.1977).

cludes items that should not be seized."
*Upham,* 168 F.3d at 535.

Scott argues that the March 12 search warrant authorized the seizure of any and all "savings account passbooks, checkbooks, check ledgers, deposit slips, withdrawal slips, bank statements, money orders, drafts, cancelled checks, lists of names, lists of telephone numbers, correspondence to/from banks, credit card issues; Federal Express receipts, etc.," and had no limitation as to name, entity, or time period, (Def.'s Mot. to Suppress at 23), concluding that the search warrant is not sufficiently particular so that " 'nothing is left to the discretion of the officer executing the warrant.' " *Fuccillo,* 808 F.2d at 175 (quoting *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506 [1965] ). This Court, however, must ascertain whether the warrant properly guides the agents' judgment in selecting what to take and is not too broad to include items that should not be seized.

In addition, Scott argues that the warrant's authorization of the seizure of *inter alia,* "credit cards; application for credit cards; cash advances; cameras; undeveloped film and the undeveloped images thereon; savings account passbooks, money orders; drafts; canceled checks; list of banks; correspondence to/from credit card issuers, Federal Express receipts; and evidence of off-site storage facilities, including rental agreements, payment slips and receipts," was beyond the scope established by probable cause.[13]

The search warrant authorized the seizure of property that constituted evidence of criminal offenses, the fruits of crime, and the instrumentalities of criminal offenses, to wit, making a counterfeit security, unlawfully producing an identification document, bank fraud, using intimidation to prevent communication of a federal offense, and conspiring to commit the foregoing offenses. Only the Federal Express receipts fall outside the scope of the probable cause established by the warrant. They are, accordingly, suppressed.

2. Limiting the Scope of the Seizure to the Stated Time Frame of the Scheme.

Scott argues that even though the affidavits gave a narrow time frame of suspected criminal activity, the search warrants did not place any corresponding restriction on the permissible scope of the seizure. In *Lafayette Academy, Inc.,* the search warrant allowed for "seizure of most every sort of book or paper at the described premises . . . ." *Lafayette Academy, Inc.,* 610 F.2d at 3.[14] In holding that the search warrant was unconstitutional, the First Circuit stated that "[i]n many instances of warrants authorizing the seizure of documents from a general file[,] efforts may also be required to narrow the documents by category, time period, and the like." *Id.* at 4 n. 4. Similarly, in *United States v. Abrams,* the Court concluded that the officers had unfettered discretion because there was no limitation in the search warrant regarding time nor any limitation on the description of the specific records to be seized. In finding a Fourth Amendment violation, the Court determined that the officers "could not or made no attempt to distinguish bona fide records from fraudulent ones so they seized all of them in order that a detailed examination could be made later." *Abrams,* 615 F.2d at 543.

Although a time limitation helps to make a search warrant sufficiently particular, it is not an absolute necessity. The First Circuit addressed this matter specifically in *United States v. Bucuvalas,* and adjudged that "[t]emporal delineations

13. Scott also argues that there was insufficient probable cause to support the seizure of computer equipment, but this matter has been resolved above.

14. In *Lafayette Academy Inc.,* the search warrant was executed by thirty government agents who employed four or five trucks to remove the materials seized.

are but one method of tailoring a warrant description to suit the scope of the probable cause showing." *United States v. Bucuvalas,* 970 F.2d 937, 942 n. 7 (1st Cir. 1992). Since temporal delineations are but one indicia for determining particularity, this factor alone may not render the search warrant a prohibited general warrant. Even though the March 12 and April 8 affidavits describe a specific time frame for the alleged criminal activity, First Circuit law does not require that the search warrants be correspondingly limited. Indeed, even if this Court were to determine that the search warrants were insufficiently particular with respect to setting forth the time period within which certain items were to be seized—and the Court does not so rule—blanket suppression of all the items seized is not the appropriate remedy. In *United States v. Riggs,* the First Circuit determined that " '[i]t would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well....' " *United States v. Riggs,* 690 F.2d 298, 300 (1st Cir.1982) (quoting 2 W. LaFave, *Search and Seizure* § 4.6[f], at 111–12 [1978] ); *see also United States v. Levasseur,* 704 F.Supp. 1158, 1173 (D.Mass.1989).

D. Government So Exceeded Scope in Execution of Search Warrant That Suppression Is Mandated.

Scott argues that the executing officers exhibited a blatant and flagrant disregard for the terms of the search warrant and that the items unlawfully seized "were more than 50% of the total number of items that were seized." (Def.'s Mot. to Suppress at 29.) Scott argues that *United States v. Fuccillo* is directly on point and controlling here. In *Fuccillo,* the court determined that the FBI could have put

specific information into the search warrant which would have allowed the executing agents to differentiate the cartons of contraband women's clothing from legitimate ones. Since the agents failed to do this, the court ruled the search warrant to be unconstitutional as a general warrant. *See Fuccillo,* 808 F.2d at 176–77. In addition, the court ruled that even though the agents were relying on a very broad warrant, they further exceeded the authority of the warrant and seized the entire contents of the warehouse. As a result, the Court determined that the agents could not reasonably have relied on the warrant, and the court suppressed all the evidence. *See id.* at 177.

The First Circuit recently addressed the issue of seizing items outside the scope of the warrant in *United States v. Hamie.* In *Hamie,* the court stated that "[a]lthough courts have periodically applied the extraordinary and drastic remedy of suppressing all evidence seized, this has occurred only in extreme situations, such as when the lawful basis of a warrant was a pretext for the otherwise unlawful aspects of a search or when the officers flagrantly disregarded the terms of the warrant." *United States v. Hamie,* 165 F.3d 80, 83–84 (1st Cir.1999). The First Circuit further stated that "the improper seizure of 'many items outside [a] warrant's scope ... does not alone render the whole search invalid and require suppression and return of all documents seized.' " *Id.* at 84 (quoting *United States v. Young,* 877 F.2d 1099, 1105 [1st Cir.1989] ).

■ Even though items were seized outside the scope of the search warrant and not under any exception,[15] the "normal remedy is to suppress the use of any items improperly taken." *Hamie,* 165 F.3d at 84. The Court, therefore, must determine which items seized by the government and intended to be introduced as evidence at

---

**15.** The government concedes in its opposition to Scott's motion to suppress that "the agents seized *some* items outside the scope of the

warrant and under no exception to the warrant requirement...." (Gov't Opp. at 13.)

trial,[16] were improperly seized and not under any applicable exception.

### E. Plain View.

In addition, Scott argues that the plain view exception for items seized outside the scope of the warrant is in-applicable here. Scott argues that each item seized must be individually justified under the plain view analysis and that with the exception of two books, *Inside Money Laundering* and *How to Investigate by Computer*, no attempt was made to do this. The First Circuit recently addressed the plain view exception in *Hamie.* The Court stated that "the 'plain view' doctrine permits law enforcement agents to seize evidence in plain view during a lawful search even though the items seized are not included within the warrant's scope." *Hamie,* 165 F.3d at 82.

■ The plain view doctrine is established by a two-part test. "First, 'an essential predicate to [the seizure of evidence not within a warrant's purview is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.'" *Id.* (quoting *Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301 [1990]). "Second, the doctrine requires that the evidence's incriminating character be 'immediately apparent' to the officer." *Hamie,* 165 F.3d at 82. Indeed, "[t]he term 'immediately apparent' has been defined as sufficient to constitute probable cause to believe it is evidence of criminal activity." *Id.* at 83. Further, "[t]his standard requires [that] '[t]here must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime. A practical, non-technical probability that incriminating evidence is involved is all that is required.'" *Id.* (quoting *United States*

*v. Giannetta,* 909 F.2d 571, 579 [1st Cir. 1990]). Scott argues that there is insufficient probable cause to justify the plain view seizure of *Inside Money Laundering* and *How to Investigate by Computer.* In response, the government argues persuasively that these two books show Scott's knowledge of money laundering and computer investigations, essential elements of the crimes described in the warrant. They are not suppressed.

■ Applying a practical, nontechnical probability analysis to the items seized by the government under the plain view doctrine, it remains for the Court to determine which items, if any, fall outside the warrant and also outside the purview of the plain view exception. Despite the thorough record proposed by the parties, the government's bold assertion of "plain view" will not carry the day with respect to items (not discussed above) which were seized outside the warrant. The parties shall prepare a joint list of such items and shall brief, as to each particular item, the applicability *vel non* of the plain view doctrine. This done, the items themselves shall be submitted to the Court for review prior to decision. Items seized pursuant to the plain view exception do not have to be contraband or actual evidence of criminal activity. Rather, there needs only to be enough facts for the reasonable person to believe that the items *may* be contraband or evidence of criminal activity.

### F. Search and Seizure of Scott's Wallet Incident to Arrest.

Scott argues that the seizure of his wallet incident to his arrest was invalid because he was arrested in front of his residence, and his wallet was located in a night stand drawer in a second floor bedroom. The government returned the wallet to Scott on June 15, 1999, and has stated that

---

**16.** In its opposition to Scott's motion to suppress, the government argues that the majority of the evidence disputed by Scott is moot because it does not intend to introduce it at trial. In *Hamie,* the Court stated "[t]o the

degree that the unauthorized items were improperly seized, there was no need to suppress them because the government never sought to introduce them at Hamie's trial." *Hamie,* 165 F.3d at 84.

it does not intend to offer the contents of the wallet in evidence. The matter is thus moot.

### G. Compliance with Federal Rule of Criminal Procedure 41(d).

 Rule 41(d) of the Federal Rules of Criminal Procedure states, "[t]he officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken." Fed.R.Crim.P. 41(d). The First Circuit has stated that " 'Rule 41(d) does require federal officers to serve upon the person searched a copy of the warrant and a receipt describing the materials obtained, but it does not invariably require that this be done before the search takes place.' " *United States v. Bonner*, 808 F.2d 864, 869 (1st Cir.1986) (quoting *Katz v. United States*, 389 U.S. 347, 356 n. 16, 88 S.Ct. 507, 19 L.Ed.2d 576 [1967] ). Indeed, " '[v]iolations of Rule 41(d) are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice....' " *Bonner*, 808 F.2d at 869 (quoting *United States v. Marx*, 635

F.2d 436, 441 [5th Cir.1981] ). To show prejudice, "defendants must show that they 'were subjected to a search that might not have occurred or would not have been so abrasive had [Rule 41(d) ] been followed.' " *Id.* (quoting *Marx*, 635 F.2d at 441).[17]

 Scott argues that upon his arrest and prior to being taken from his residence, he asked for a copy of the arrest and search warrants and his request was denied.[18] Further, Scott argues that he was given a copy of the affidavit in support of the warrants a few hours later, but he was never given a copy of the search warrant nor was a copy of the search warrant left at his premises.[19] Moreover, Scott argues that his receiving a copy of the search warrant on April 8, 1999 pursuant to the government's automatic discovery was an attempt to circumvent suppression motions then pending before Judge O'Toole in another case,[20] with the result that Scott was unable to determine whether to file a further suppression motion in that case. Finally, Scott argues that the 41(d) violation was deliberate because the agents executing the warrant had over twenty-five years of experience in the aggregate and would have known that they were required to leave a copy of the search warrant at the residence searched.

17. *Bonner*, however, deals with officers who searched a residence without having a copy of the warrant with them. In this case, Scott argues that the agents had the warrant and flatly refused to give a copy to him.

18. This is disputed by the government in an affidavit by Graham. (Gov't App. Ex. 7.)

19. Scott's contention that he asked for a copy of the search warrant, and his contention that a copy of the search warrant was not left at his premises is also in dispute. According to the affidavit of special agent William Cameron, Scott did not ask for a copy of the warrant. (Gov't App. Ex. 6 ¶ 8.) Further, the government argues that a copy of the search warrant and inventory was left at Scott's residence. (*See Id.* ¶ 12.)

In support of his claim, Scott makes four arguments: (1) Since Agent Cameron inaccurately recalled in September the clothes worn by Scott on March 16, he cannot be expected to have an accurate memory about whether

or not Scott asked for a copy of the warrant. (2) Scott has been the subject of three previous searches by the IRS and has explicitly asked for such paperwork on each occasion in the past. (3) Had a copy been left at Scott's residence, counsel would not have sought a copy from the First Assistant U.S. Attorney, Mark Pearlstein. (4) The sworn affidavit of Brian McKinnon that no copy of the search warrant was left at Scott's residence was corroborated by the Plymouth Jail taped phone call that Scott placed to McKinnon that evening.

20. Scott argues that the seizure of certain items in his wallet during the pendency of the suppression hearing before Judge O'Toole gives rise to the suspicion that the government was thereby attempting to circumvent the then pending suppression motions by establishing a new basis for introducing such evidence.

Since this motion has been submitted on the papers, the Court must take the facts in the light most favorable to Scott. Even so, Scott is unable to show that he was legally prejudiced by receiving the search warrant on April 8, 1999. Scott argues that the continuation of the February 23, 24, and 26 suppression hearings before Judge O'Toole was set for March 27th. The March 27th hearing, however, was further postponed to April 26, 1999, a continuance that occurred well after March 16, 1999, the date of the search. Scott thus had from April 8th until April 26th to file a "new" suppression motion before Judge O'Toole. He did not. Had the suppression hearing been held on March 27th as originally scheduled, Scott might have been able to show legal prejudice in the matters pending before Judge O'Toole due to what this Court assumes was a Rule 41(d) violation. Regardless, the matter before Judge O'Toole is immaterial to these proceedings. Scott was not legally prejudiced or precluded from filing a suppression motion in that case.

In order to show prejudice, Scott must show that, absent the Rule 41(d) violation, the search would not have occurred or it would not have been as abrasive. Scott was arrested immediately and removed from the premises before the search was undertaken. As a result, it is reasonable to infer that the nature of the search would not have changed even if Scott had been given a copy of the warrant prior to the search. It is also reasonable to infer that the same search would have occurred whether or not a copy of the warrant was left at the premises. Had Scott been present during the search after being refused a copy of the search warrant, however, he might have been able to show prejudice as matter of law,[21] a point this Court need not now address.

## H. *Leon* "Good Faith" Exception.

Since this Court upholds the warrant, further analysis is unnecessary. Still, for the sake of completeness, the Court considers whether the officers acted in "good faith."

In *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial cost of exclusion." The courts have noted, however, that this good-faith exception is subject to at least four exclusions:

(1) "When the magistrate ... was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) "where the issuing magistrate wholly abandoned his [detached and neutral] judicial role"; (3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where a warrant is "so facially deficient—i.e. in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir.1999) (quoting *Leon*, 468 U.S. at 923, 104 S.Ct. 3405).

Scott argues that (1) the warrant affidavit did not supply a substantial basis for probable cause, (2) the officers' objective good faith was totally undermined by the executing agents' blatant and flagrant disregard for the terms of the search warrant, and (3) the search warrant was so

---

**21.** This appears to be the case in the Ninth Circuit case of *United States v. Gantt*, 194 F.3d 987 (9th Cir.1999). In *Gantt*, the Ninth Circuit held that a deliberate disregard for Rule 41(d) is grounds for suppressing evidence. In *Gantt*, the defendant sat in the hallway while the agents conducted a three- hour search of her residence. The defendant asked to see a complete copy of the search warrant and the agents failed to show it to her. The Ninth Circuit found this "deliberate" violation of Rule 41(d) to be sufficient to mandate suppression of the evidence obtained in the search.

"facially deficient" that no reasonable well-trained federal officer could have relied upon it.

■ The Court has already rejected Scott's arguments. The Court must still make a determination, however, whether the search warrant was so facially deficient in particularizing the things to be seized that the executing officers could not reasonably have presumed the warrant to be valid. It was not. While the warrant could have further subclassified certain items, *see United States v. Diaz*, 841 F.2d 1, 6 (1st Cir.1988), it was not so facially deficient that a reasonable law enforcement officer acting in objective good faith would have known it to have been invalid.

## IV. Conclusion.

For the reasons set forth above, the motion to suppress is ALLOWED as to the Federal Express receipts, but DENIED in all other respects save as to the items not identified in the warrant (and not otherwise identified in this opinion), the seizure of which the government must now justify under the "plain view" doctrine. As to these items, further proceedings are ordered pursuant to this opinion.