# United States Court of Appeals
## For the First Circuit

Nos. 13-2343
    13-2344
    13-2350

UNITED STATES OF AMERICA,

Appellee,

v.

CARMEN SOTO; PEDRO SOTO; and STEVEN SOTO,

Defendants, Appellants.

———————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Mark L. Wolf, U.S. District Judge]

———————

Before
Torruella, Thompson, and Kayatta,
Circuit Judges.

———————

    Matthew A. Kamholtz, with whom Feinberg & Kamholtz, was on brief, for appellant Carmen Soto.
    Steven A. Feldman, with whom Feldman and Feldman, was on brief, for appellant Pedro Soto.
    Benjamin L. Falkner, with whom Krasnoo|Klehm LLP, was on brief, for appellant Steven Soto.
    John M. Pellettieri, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, John A. Capin, Assistant United States Attorney, and Brian A. Pérez-Daple, Assistant United States Attorney, were on brief, for appellee.

———————

August 25, 2015

———————

**TORRUELLA, Circuit Judge**.  The Soto family -- Steven and his parents Carmen and Pedro[1] -- operated a real estate business in Lynn, Massachusetts, which they used to orchestrate several fraudulent real estate transactions in late 2006 and early 2007. As a result of these transactions, the Sotos were each convicted of multiple counts of mail fraud; Steven and Pedro were also convicted of multiple counts of aggravated identity theft.  Defendants now appeal their convictions, alleging a host of errors before the district court.  In addition, Carmen challenges the portion of her sentence requiring her to pay almost $800,000 in restitution.  For the reasons detailed below, we reject these challenges and affirm.

## I.  Background

### A.  The Fraudulent Transactions

The Sotos used Paradise Real Estate, the real estate brokerage firm they legitimately owned and operated, to conduct a number of fraudulent real estate transactions.  Four separate transactions underlie the charges in the indictment, but they share a common theme.  In each transaction, at least one member of the Soto Family used the identity of a third-party individual to consummate the "sale" of real estate.  To finance the transaction, a loan would be obtained based on an application containing

---

[1]  Because Steven, Carmen, and Pedro Soto all have the same last name, we will refer to them individually by their first name only. When referring to them collectively, we will use either "the Sotos," "the Soto Family," or "Defendants."

knowingly false information.  Not surprisingly, the loans were often not repaid, resulting in the properties entering foreclosure soon after the transaction closed.

In addition to the Sotos, three individuals played important roles in the scheme -- some without their knowledge. First was Gregory Bradley.  Bradley, who was a friend of Steven's, often played the role of buyer despite his being in prison from August 2006 through September 2008.  To overcome this obstacle, Steven approached the second repeat player, Kim Litwin.  Litwin is Bradley's aunt, and, after consulting with Bradley, she agreed to help Steven use Bradley's identity.  Finally, we have Milagros Espinal, a notary public.  Without Espinal's knowledge, Steven obtained a duplicate notary kit in her name and used the kit to make documents appear notarized, and thus legitimate.

With the key players identified, we can now describe the four real estate transactions at issue.

### 1.  **242 Main Street**

The first relevant transaction took place in Fall 2006 and involved 242 Main Street in Springfield, Massachusetts -- a property owned by Pedro.  Steven arranged for Bradley, through Litwin, to purchase the property from Pedro for $182,000.  Someone posing as Bradley -- the record is unclear as to who -- spoke to a mortgage loan officer by phone and told the loan officer that Bradley was a store manager at Drestars barbershop -- a barbershop

opened by Steven in Lynn, Massachusetts. This, of course, was not true as Bradley was incarcerated at the time. The loan officer was also told that Bradley possessed $14,191 in liquid assets. This, too, was false. The $14,191 was actually the amount in Litwin's bank account; on Steven's instructions, she had recently added Bradley to the account to make it appear as though he had sufficient assets.

In November 2006, Steven and Litwin attended the closing for the property. Litwin produced a forged document drafted by Steven and "notarized" with the false Espinal notary kit to claim power of attorney to conduct the transaction on behalf of Bradley. Using the power of attorney, Litwin signed documents confirming the false information about Bradley's employment, assets, and intent to live in the property as his primary residence.

### 2. 55 Lawrence Street

The next transaction involved 55 Lawrence Street, a three-family home in Salem, Massachusetts. In the fall of 2006, Beatrice Jimma Shea, the owner of the property, asked Pedro -- who had previously been successful in helping Shea rent a unit in the home -- to help her either find a tenant for one of the units or sell the property. Pedro arranged for Shea to enter into an agreement with Bradley whereby Bradley would lease 55 Lawrence Street and have the option of purchasing the property and converting it into condominiums. Shortly thereafter, Steven,

-4-

posing as Bradley, attempted to convince Shea to sell the property to him so he could turn around and sell the units as condominiums. When Shea refused, Steven forged her signature on numerous documents, thus giving Bradley power of attorney to conduct the transactions. To make the documents appear legitimate, Steven used the fake Espinal notary kit.

Using these forged documents, the Sotos "sold" each of the three units of 55 Lawrence Street to straw buyers. Pedro sold Unit 1 to Pamela Landess in January 2007 after agreeing to pay her $8,000 for her participation. At closing, Steven -- still posing as Bradley -- used the forged power of attorney to sign Bradley's name as attorney in fact for Shea, the seller.

Carmen, meanwhile, paid Medelin de la Cruz $10,000 for her assistance in purchasing Units 2 and 3 for $225,000 and $230,000, respectively. In preparation for the sales, Carmen and Steven submitted de la Cruz's loan applications which substantially overstated de la Cruz's salary, failed to disclose de la Cruz's prior mortgages, and falsely represented that de la Cruz intended to make each unit her primary residence. The loans were approved, and the closings took place in January and February of 2007. Like with Unit 1, Steven attended the Unit 2 closing as Bradley and used the forged power of attorney to sign Bradley's name as attorney in fact for Shea, the seller. As for Unit 3, a different approach was taken. Prior to closing, Steven used the fake Espinal notary kit

to transfer title from Shea to Bradley.  Thus, Litwin was able to attend the closing for Unit 3 as attorney in fact for Bradley, the seller.

### 3.  399 Orange Street

In January 2007, Steven and Pedro arranged for Bradley to purchase 399 Orange Street in Springfield, Massachusetts.  On the loan application, Pedro provided his phone number as the contact number for Bradley.  When the loan officer -- somewhat skeptical of the application -- called the number two days before the closing, someone purporting to be Bradley answered the phone and verified false information.  At the closing itself, Steven signed Bradley's name on the loan documents containing the same false information that had been verified two days earlier.  This included, for example, that Bradley earned $11,500 each month from his employment at Steven's barbershop and from his ownership of Aggressive Construction -- a fake company formed by Steven in Bradley's name.  Steven also verified the accuracy of the loan application's liability section, which omitted any mention of Bradley's mortgage for 242 Main Street.

### 4.  21 Dudley Street

Finally, in December 2006/January 2007, Karen and Christopher Faison, the owners of 21 Dudley Street in Haverhill, Massachusetts, agreed to allow the Sotos to convert their property into three condominiums, to sell the units, and to keep any

proceeds above the $365,000 they originally paid for the property.
The sale of these units began as legitimate sales: Carmen's cousin
and her husband were to purchase the first unit and Ángel
Rodríguez, Carmen's longtime family friend, intended to purchase
the other two units as investments.  Prior to the closings in May
2007, however, Rodríguez changed his mind when he realized that the
mortgage payments would exceed the rent rolls.

Rodríguez thus informed Carmen that he did not want to go
through with the purchases, but Carmen proceeded anyway.  She
enlisted Yéssica Amaro -- Rodríguez's stepsister and Steven's
girlfriend -- to execute a forged power of attorney and to attend
the closings on Rodríguez's behalf.[2]  With the power of attorney in
hand, Amaro completed the transactions.  As a result, absent his
knowledge and despite his intentions to the contrary, Rodríguez
purchased both units and obtained two loans to do so.

**B.  The Trial Proceedings**

In connection with these four fraudulent real estate
transactions, the Sotos were charged in a thirteen-count indictment
on September 8, 2011.  Steven was charged with seven counts of mail
fraud (Counts One, Four, Six, Seven, Ten, Twelve, and Thirteen) and
six counts of aggravated identity theft (Counts Two, Three, Five,
Eight, Nine, and Eleven); Pedro was charged with five counts of

---

[2]  Unlike the other transactions, the fake Espinal notary kit was
not used to notarize Amaro's power of attorney.  Instead, Carmen
had her cousin, Yaimet Vallejo, notarize the document.

-7-

mail fraud (Counts One, Four, Six, Seven, Ten) and three counts of aggravated identity theft (Counts Three, Five, and Eleven); and Carmen was charged with four counts of mail fraud (Counts Six, Seven, Twelve, and Thirteen).

After a fourteen-day trial -- the relevant details of which are addressed below -- Pedro and Carmen were convicted on all counts, while Steven was convicted on every count except the two mail fraud counts related to 21 Dudley Street (Counts Twelve and Thirteen). The district court sentenced Steven to sixty-five months of imprisonment followed by four years of supervised release and ordered him to pay $1,055,474 in restitution. Pedro, meanwhile, was sentenced to forty-eight months of imprisonment, three years of supervised release, and ordered to pay $1,055,474 in restitution. Finally, the district court sentenced Carmen to one year and one day of imprisonment (six months of which were served in home confinement), three years of supervised release, and an order to pay $792,559 in restitution. All three Sotos timely appealed.

## II. Discussion

### A. Motion to Suppress

#### 1. Relevant Background

While law enforcement did not become aware of the fraudulent real estate transactions until 2007, Steven was on their radar much earlier in relation to a number of unrelated fraudulent

schemes.  First, on March 16, 2006, Eastern Bank issued a fraud alert after Steven and his brother, Pedro, Jr., negotiated counterfeit checks.

Then, a couple weeks later, on April 3, 2006, Motorcycles of Manchester reported to New Hampshire authorities that they had sold two motorcycles to a male and female using a fraudulent cashier's check issued by St. Jean's Credit Union.  An investigation revealed that Steven had recently opened an account at the credit union and purchased three official bank checks with information similar to the counterfeit check.  When authorities showed a Motorcycles of Manchester employee a photo array, she stated that two people "looked familiar": Steven and Amaro.

A similar incident occurred at North Reading Motor Sports Inc.  On April 12, 2006, the company alerted authorities that on or about April 6, 2006, St. Jean's Credit Union had issued a check to Steven in the amount of $5.00.  However, the check had been altered to read $20,350.00 and had been used to purchase two motorcycles from North Reading Motor Sports.  In connection with the purchase, Steven had submitted a credit application listing Paradise Real Estate as his employer.  A third incident with comparable details occurred at Kelly Motor Sports in Danvers, Massachusetts, as well.

On April 28, 2006, after learning that Steven was the affiant on documents submitted to the Massachusetts Registry of Motor Vehicles, Massachusetts State Police obtained a warrant to

arrest Steven, who lived with his parents at 56 Lawrence Road in Lynn, Massachusetts ("56 Lawrence Road" or the "Soto Family Residence"). When law enforcement went to arrest Steven, they were unable to locate him. However, one of the officers executing the warrant entered a fenced-in area of the property, used a flashlight to look into a garage window, and observed a motorcycle with a license plate matching one of the motorcycles that had been purchased fraudulently and reported stolen. Based primarily on this discovery, the police obtained a search warrant for 56 Lawrence Road. The search of the house and a desktop computer found inside the house uncovered three stolen motorcycles and a significant number of documents, many related to the use of counterfeit checks to purchase the motorcycles. For reasons unclear from the record, the authorities never arrested Steven, instead continuing their investigation.

Almost one year later, on February 2, 2007, Steven returned to Eastern Bank, this time pretending to be Bradley. He withdrew $9,500 from an account he had opened in December 2006 under Bradley's name without incident, but due to his odd behavior, the bank teller became suspicious and alerted Eastern Bank's fraud investigator. The investigator, recognizing Steven's picture from the March 2006 alert, issued another security alert. Later that same day, Steven returned to Eastern Bank and, using a driver's

license and credit card issued in Bradley's name, tried to cash a check paid to Bradley. The bank quickly notified the police.

When the officers arrived and questioned Steven, he told them that Bradley was his friend and business partner and that because Bradley was in jail, Bradley had given Steven power of attorney. In support of this claim, Steven showed the officers documentation notarized by Espinal. The bank teller, however, informed the police that Steven never claimed power of attorney but rather passed himself off as Bradley. Given this information, the officers arrested Steven.

As they escorted Steven from the bank, the police saw Steven gesture to a female sitting inside a grey Chrysler. A short while later, at the police station, the officers overheard Steven's phone call where he told the listener "[d]on't show up at the police station with the Chrysler" and "[c]all Jeff, he'll know what to do with the cars." Despite this warning, Amaro and Litwin soon arrived at the police station in the grey Chrysler. The officers, suspicious of both the gesture in the bank parking lot and Steven's subsequent phone call, checked the registration for the Chrysler. They discovered that it had been purchased just a few days earlier -- on January 29, 2007 -- and was registered to Bradley. Given that Bradley was incarcerated at the time and that Steven had just attempted to pass himself off as Bradley at Eastern Bank, the officers suspected that this registration was also fraudulent, so

when Amaro and Litwin confirmed that the Chrysler belonged to Bradley, the police seized it.

An inventory search of the Chrysler uncovered documents related to three vehicles purchased in Bradley's name in December 2006 and January 2007, a Gateway laptop computer, and a document seeming to give Steven power of attorney for Bradley. Subsequent investigation by the police discovered that the power of attorney was forged and that Steven had claimed to be Bradley when the Chrysler was purchased at the dealership.

On March 30, 2007, United States Secret Service Special Agent Trent Everett applied for a search warrant for the Gateway laptop. The affidavit in support of the warrant discussed the investigation of Steven prior to the 2006 search of the Soto Family Residence, the information obtained in connection with that search, the events surrounding Steven's February 2007 arrest, the investigation following the arrest, and the inventory search of the Chrysler. As to the 2006 search of the Soto Family Residence, the affidavit stated as follows:

> 6. Later on April 28, 2006, I accompanied local and State Police officers to execute the arrest warrants for Steven and Pedro Soto[, Jr.]. Upon arrival at 56 Lawrence Road, an officer saw a motorcycle bearing Massachusetts license plate number SZ6659 through a garage window. Officers immediately learned that the motorcycle had been reported stolen on April 1, 2006 in Danvers, Massachusetts. After observing that nobody appeared to be present at 56 Lawrence Road, officers set up a surveillance of the

residence. Officers also obtained, from the Lynn District Court, a warrant to search 56 Lawrence Road.

7. Also on April 28, 2006, I participated, along with officers of the Lyn[n] Police Department, North Reading Police Department, and Massachusetts State Police, in executing the search warrant at 56 Lawrence Road in Lynn, Massachusetts. Among the items seized during the search warrant were three stolen motorcycles, a Dell desk top computer, official bank checks, Massachusetts driver's licenses in various names, fraudulent documents purporting to have been issued by the Massachusetts Registry of Motor Vehicles ("RMV"), and counterfeit bank documents. Also seized was [a] handwritten document, which appeared to [be] Steven Soto's first-person account of his participation in various criminal activities.

8. On May 24, 2006, the Lynn District Court issued a warrant to search the desk top computer seized during the search of 56 Lawrence Road. A forensics examination of that computer revealed images of checks, driver's licenses, a typed version of the first-person account of Steven Soto's participation in various criminal activities . . . , Massachusetts RMV documents, and fraudulent lien releases for vehicles. . . .

9. The names on the driver's licenses found scanned into the computer seized at 56 Lawrence Road were Christine Escribano . . . , Pedro Soto . . . , Pedro M. Soto . . . and Geovany Anthony Jiménez . . . .

10. It is apparent that the computer seized at 56 Lawrence Road was used to generate documents used in fraudulent transactions such as the one described above. Images of bank checks located on that computer match bank checks found during the search [of] 56 Lawrence Road. They also match counterfeit checks that have been used to purchase cars and motorcycles. Other document[s] apparently

> generated by using that computer include
> fictitious employment pay stubs, fraudulent
> lien releases, fraudulent driver's licenses,
> and fraudulent titles of ownership.

Based on this information and the evidence gathered after Steven's February 2007 arrest, the warrant was issued, and the search of the laptop uncovered W-2 forms for Carmen and Bradley, pay stubs showing payments from Paradise Real Estate to Bradley, and a cable bill in Bradley's name.

On May 16, 2007, Agent Everett applied for a warrant to search the Soto Family Residence at 56 Lawrence Road. The affidavit in support of this warrant included the same information as the warrant for the Gateway laptop but also contained information that law enforcement had subsequently discovered. This consisted of: (1) the contents of the Gateway laptop; (2) a website advertising an unauthorized raffle for 56 Lawrence Road "mortgage free"; (3) that Steven and Pedro had used Bradley's identity to buy real estate such as 55 Lawrence Street and 399 Orange Street; and (4) recorded phone conversations in February and March 2007 between Steven (while incarcerated) and his parents at 56 Lawrence Road which discussed criminal activity. The magistrate judge authorized the search warrant for the Soto Family Residence, and the subsequent search uncovered additional incriminating pieces of evidence for all three members of the Soto Family.[3]

_____

[3] The parties do not detail what exactly was discovered, but Steven alleges that forty-nine of the exhibits introduced at trial

-14-

Prior to trial, Defendants filed a motion to suppress the evidence seized from the Gateway laptop and from the 2007 search of 56 Lawrence Road. They argued that in a separate proceeding charging Steven with fraud and identity theft in connection with the above-described motorcycles and automobiles, the district court had suppressed the evidence obtained during the April 2006 search of the Soto Family Residence because it concluded that the officer violated Steven's Fourth Amendment rights when he entered the curtilage and observed the motorcycle in the garage, and without that knowledge, there was no probable cause to search the residence. According to the Sotos, this suppression ruling was entitled to collateral estoppel in the present case as well. Therefore, the inclusion of the fruits of that search in the affidavits supporting the warrants for the subsequent searches of the laptop and Soto Family Residence unconstitutionally tainted them, requiring suppression of that evidence as well.

The district court held an evidentiary hearing on the motion on January 11, 2013, during which Agent Everett, the affiant, testified. Agent Everett conceded that the April 2006 search "g[a]ve us a lot of information that we went forward on," but also testified that even without that information, given the wealth of other evidence and information the officers had, they

were seized during the search.

still would have obtained search warrants for the laptop and residence.

On January 14, 2013, the court orally announced its ruling. Though it agreed that the Sotos were entitled to collateral estoppel as to the suppression of the April 2006 search, the court denied the motion to suppress, finding it "not meritorious" due to the independent source doctrine. As to the laptop, the court explained that

> [t]he law enforcement officers were not prompted to seek a warrant because of the information derived from the unlawful search of Lawrence Street in 2006[;] rather they would have seized the Chrysler and obtained a warrant for the search of the computer without that information.
>
> Law enforcement had substantial reason to believe that Steven Soto was involved in fraud before April 28, 2006. Much of that information is in the April 28, 2006 search warrant . . . . Amaro was described in the affidavit in support of that warrant as a person in whose name fraudulently-obtained vehicles were put. . . .
>
> In addition, without Paragraphs 6 to 10, which include suppressed information derived from the 2006 search, um, the affidavit for the laptop, viewed objectively, contains ample information to establish probable cause to search the computer. A reasonable magistrate would have issued the warrant even if it did not contain any of the unlawfully-obtained information that was included in the affidavit.

Its explanation as to the 2007 search of 56 Lawrence Road was similar:

-16-

Once again I find the government has proven that law enforcement was not prompted to get the 2007 warrant for Lawrence Road by the fruits of the unlawful 2006 search. It would have sought that warrant without information derived from the 2006 search. Among other things, law enforcement knew that the three defendants lived at that residence. The First Circuit has recognized that criminals often keep incriminating items in their residences. . . . However, there was far more than that expert knowledge on the part of Everett in this case.

For example, as recited in his affidavit, 56 Lawrence Road had been offered as a prize in an unlawful raffle . . . . In addition, Steven Soto's tape-recorded telephone calls from the Essex County jail reflected that he was discussing criminal activity with his parents while they were at Lawrence Road, indicating that they knew of his criminal activity and that that would be a safe haven or a safer haven for keeping evidence of it. In addition, without the information derived from the unlawful search in 2006, there was ample evidence establishing probable cause to search Lawrence Street.

## 2. **The Motion Was Properly Denied**

Steven argues that the district court misapplied the independent source doctrine and thus erroneously denied the Sotos' joint motion to suppress the evidence seized from the 2007 searches of the grey Chrysler and Soto Family residence. We disagree.

In Murray v. United States, the Supreme Court explained that the Fourth Amendment's "exclusionary rule . . . prohibits the introduction of derivative evidence . . . that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the

-17-

connection with the unlawful search becomes so attentuated [sic] as to dissipate the taint." 487 U.S. 533, 536-37 (1988) (internal quotation marks omitted). However, the point of the rule is "in deterring unlawful police conduct" and "putting the police in the same, not a _worse_, position that they would have been in if no police error or misconduct had occurred." _Id._ at 537 (emphasis in original) (quoting _Nix_ v. _Williams_, 467 U.S. 431, 443 (1984)). The exclusionary rule is not meant to be a windfall for a defendant. Accordingly, "information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." _Id._ at 538-39 (quoting _United States_ v. _Silvestri_, 787 F.2d 736, 739 (1st Cir. 1986)); _see also_ _Silverthorne Lumber Co._ v. _United States_, 251 U.S. 385, 392 (1920) ("Of course this does not mean that the facts thus [illegally] obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . . .").

This independent source doctrine applies to both the "rediscovery of intangible evidence already discovered" and the "reseizure of tangible evidence already seized." _Murray_, 487 U.S. at 542; _see also_ _id._ ("So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply."). In the case of a search warrant premised on an application containing

illegally obtained evidence -- the issue before the <u>Murray</u> Court and before us today -- the fruits of that search would be admissible through the independent source doctrine unless (1) "the agents' decision to seek the warrant was prompted by what they had seen during" the initial illegal search or (2) "information obtained during that [illegal search] was presented to the Magistrate and affected his decision to issue the warrant."  <u>Id.</u>

   We had the opportunity to interpret <u>Murray</u> in <u>United States</u> v. <u>Dessesaure</u>, 429 F.3d 359, 365 (1st Cir. 2005).  After detailing <u>Murray</u> and examining its place in Supreme Court Fourth Amendment jurisprudence, we looked at the two situations laid out in <u>Murray</u> as not justifying the use of the independent source doctrine and concluded that they formed a two-prong test.  As to the first prong -- that "the agents' decision to seek the warrant was [not] prompted by what they had seen during their initial entry" -- we explained that this was a subjective analysis: "would these particular police officers have sought the warrant even if they had not known, as a result of the illegal search," that relevant evidence was present in the apartment.  <u>Dessesaure</u>, 429 F.3d at 369.  We cautioned, however, that "it should not be proven by purely subjective means."  <u>Id.</u>  To the contrary, "[i]n making the factual determination as to the police officers' intent, the district court is not bound by after-the-fact assurances of their intent, but instead must assess the totality of the attendant

-19-

circumstances to ascertain whether those assurances appear 'implausible.'" Id.

As to the second prong -- whether such information "affected [the Magistrate's] decision to issue the warrant" -- we acknowledged a seeming tension with Franks v. Delaware, 438 U.S. 154 (1978), but ultimately held that

> the Court in Murray did not intend to add anything to the pre-existing Franks approach to evaluating warrant applications containing tainted information . . . . Thus, when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause.

Dessesaure, 429 F.3d at 367.

Steven contends that our determination in Dessesaure that the second Murray factor is synonymous with a Franks analysis directly contradicts Murray's plain language, and thus cannot stand. This argument is easily dispensed with. "We have held, time and again, that in a multi-panel circuit, prior panel decisions are binding upon newly constituted panels in the absence of supervening authority [such as a new Supreme Court opinion or an en banc decision] sufficient to warrant disregard of established precedent." Muskat v. United States, 554 F.3d 183, 189 (1st Cir. 2009) (quoting United States v. Wogan, 938 F.2d 1446, 1449 (1st

Cir. 1991)).  Steven points to no recent Supreme Court case or en banc opinion questioning <u>Dessesaure</u>, and thus it is binding.[4]

Steven also argues that, even if <u>Dessesaure</u> is correct, the district court misapplied it.  Our review of the district court's decision is bifurcated: its determination on prong one -- whether the agents' decision to seek the warrant was prompted by the initial illegal search -- is a factual finding subject to clear error review while its prong two determination -- whether the information obtained during the illegal search affected the magistrate's decision -- is a legal conclusion reviewed <u>de novo</u>. <u>United States</u> v. <u>Siciliano</u>, 578 F.3d 61, 69 (1st Cir. 2009); <u>Dessesaure</u>, 429 F.3d at 365; <u>United States</u> v. <u>Weidul</u>, 325 F.3d 50, 51 (1st Cir. 2003).

Turning to prong one, we find no clear error with the district court's conclusions.  Before the illegal April 2006

---

[4]   We note, however, that even if we were able to revisit <u>Dessesaure</u>, such a revisiting would begin with the observation that the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits have all interpreted <u>Murray</u> the same way, and for what it's worth, the Supreme Court has denied petitions for certiorari in many of those cases. <u>See</u> <u>United States</u> v. <u>Swope</u>, 542 F.3d 609, 614 (8th Cir. 2008), <u>cert. denied</u>, 555 U.S. 1145 (2009); <u>United States</u> v. <u>Jenkins</u>, 396 F.3d 751, 760 (6th Cir. 2005), <u>cert. denied</u>, 546 U.S. 813; <u>United States</u> v. <u>Davis</u>, 313 F.3d 1300, 1304 (11th Cir. 2002), <u>cert. denied</u>, 540 U.S. 827 (2003); <u>United States</u> v. <u>Markling</u>, 7 F.3d 1309, 1316 (7th Cir. 1993); <u>United States</u> v. <u>Johnson</u>, 994 F.2d 980, 987 (2d Cir. 1993), <u>cert. denied</u>, 510 U.S. 959; <u>United States</u> v. <u>Restrepo</u>, 966 F.2d 964, 968-70 (5th Cir. 1992), <u>cert. denied sub nom</u> <u>Pulido</u> v. <u>United States</u>, 506 U.S. 1049 (1993); <u>United States</u> v. <u>Herrold</u>, 962 F.2d 1131, 1141 (3d Cir. 1992), <u>cert denied</u>, 506 U.S. 958; <u>United States</u> v. <u>Gillenwaters</u>, 890 F.2d 679, 681-82 (4th Cir. 1989).

search, law enforcement officials were already investigating Steven for fraud and identity theft. After being alerted by Eastern Bank in 2007 that Steven was once again trying to pass counterfeit checks, they arrested Steven and escorted him off the premises. While doing so, they observed Steven signal to a woman in a grey Chrysler and then later overheard Steven on the phone telling the listener not to bring the Chrysler to the police station. Thus, it is not at all surprising that when the Chrysler nevertheless showed up at the police station, the officers wanted to see what was inside. After validly seizing the Chrysler and conducting an inventory search, the officers found a power of attorney later determined to be forged, documentation that the vehicles were registered in Bradley's name (also later determined to be fraudulent), and the Gateway laptop. With these forged documents located in close proximity to the laptop, and contained in a vehicle Steven did not want brought to the station, there is little doubt that any reasonable officer would have believed the laptop was involved in the fraud and would have wanted to search it. We thus agree with the district court's conclusion that Everett's decision to obtain the search warrant was not prompted by the 2006 search, and therefore there is no clear error.

We reach the same conclusion regarding the 2007 search of 56 Lawrence Road. The district court believed Agent Everett's testimony that he would have wanted to search the residence even

without the information learned in the 2006 search: (1) because there was ample evidence that Steven was engaged in fraud and identity theft; (2) because of his belief that those engaging in fraud often keep evidence of the fraudulent activity in their home; (3) because of the unauthorized "raffle" offering the Soto Family Residence as a "mortgage free" prize; and (4) because of the jail-house call between Steven and his parents openly discussing the fraud and thus suggesting that they, too, were either involved in or aware of the fraud and would thus likely provide a safe haven for evidence. Though this rationale is not as convincing as the rationale for obtaining a warrant for the laptop, it was not clearly erroneous for the district court to conclude as it did that Agent Everett would have still sought the search warrant for 56 Lawrence Road without the evidence seized during the 2006 search.

Steven counters that the district court failed to take into account all of the new leads and suspects uncovered during the 2006 search, which he claims "catapulted the investigation . . . light years ahead." But even ignoring everything that happened prior to Steven's attempt to pass fake checks at Eastern Bank in 2007, "the totality of the attendant circumstances" from February 2007 onward support Agent Everett's assurances. See Dessesaure, 429 F.3d at 369. Similarly, Agent Everett's candid acknowledgment that the 2006 evidence was a factor in his initial decision to seek the warrants does not undermine our conclusion. The question is

not whether the evidence did influence the officer's decision -- how could it not?[5] -- but whether the same decision would have been made if the evidence had not been known.  The district court concluded that it would have, and we are not "left with a definite and firm conviction" that this was a mistake.  See United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011) ("[C]lear error exists only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." (internal quotation marks omitted)).  Accordingly, prong one of the Murray/Dessesaure test is satisfied for both searches.

As for prong two, the district court correctly concluded that with the paragraphs containing the illegal evidence excised, there was still enough information to establish probable cause that both  "(1) a crime has been committed (the 'commission' element), and (2) enumerated evidence of the offense will be found at the place to be searched (the 'nexus' element)."  United States v. Strother, 318 F.3d 64, 67 (1st Cir. 2003).  Steven only contests the nexus element, however, so that is where we focus our discussion.  For probable cause to exist, "the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found."  United States v.

---

[5]  Indeed, given the evidence discovered during the 2006 search and the facts presented at the hearing, we would be highly skeptical if Agent Everett had testified that the 2006 search had had no impact on his decision to seek the 2007 warrants.

<u>Feliz</u>, 182 F.3d 82, 86 (1st Cir. 1999) (quoting <u>Texas</u> v. <u>Brown</u>, 460 U.S. 730, 742 (1983) (plurality opinion)).  They do not "demand showing that such a belief be correct or more likely true than false."  <u>Id.</u> (internal quotation marks omitted).

Regarding the search of the laptop, we have little doubt that a nexus was established.  As discussed above, the laptop accompanied Steven on his trip to commit fraud on Eastern Bank and was discovered in a vehicle fraudulently registered to Bradley and which Steven had instructed Amaro not to bring to the police station.  Located inside this vehicle was not only the laptop, but also a forged power of attorney and fraudulent registration records.  Given the laptop's proximity to the forged documents and its location in a fraudulently registered vehicle, it was reasonable to believe that the laptop might also be an instrument of Steven's criminal activity and thus might contain additional evidence.  <u>See</u> <u>United States</u> v. <u>Scott</u>, 270 F.3d 30, 59 (1st Cir. 2001) (adopting the rationale of <u>United States</u> v. <u>Scott</u>, 83 F. Supp. 2d 187, 197 (D. Mass. 2000), that "it is equally reasonable to suppose that someone allegedly engaged in bank fraud and producing false securities on his computer would have records of the bank fraud and false securities on that computer").  Indeed, Agent Everett stated as much in his affidavit.  This is sufficient to establish the nexus element.  <u>See</u> <u>Feliz</u>, 182 F.3d at 86.

There was also probable cause to believe that evidence of the fraudulent schemes would be found at 56 Lawrence Road. Agent Everett's affidavit stated that in his "experience and in the experience of other [Secret Service] agents, individuals engaged in fraud and identity theft keep at their residences records related to and used in their criminal activities." Not only have we time and again "endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination," United States v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014) (citing cases), but the additional untainted information contained in the affidavit supported this finding. The affidavit noted that the search of the Gateway laptop found in the Chrysler uncovered pay stubs from Paradise Realty to Bradley, thus linking Paradise Realty -- which was owned and operated by Steven, Carmen, and Pedro -- to the fraudulent schemes. Given that Steven and his parents openly discussed criminal activity during Steven's jail-house phone call, it was unlikely that Steven was using Paradise Realty for his fraud without his parents knowledge, and more likely that Carmen and Pedro were involved in these schemes.[6] And because all three lived at 56 Lawrence Road, it is a "practical, commonsense" conclusion that they might keep evidence of their fraud and identity theft -- such as additional computers, scanners,

---

[6] In fact, the affidavit also alleged that Pedro was involved in a real estate transaction which fraudulently used Bradley's name.

-26-

bank records, and identification documents -- there. <u>Feliz</u>, 182 F.3d at 86; <u>see also</u> <u>Floyd</u>, 740 F.3d at 35; <u>Scott</u>, 270 F.3d at 59 (adopting the rationale of <u>Scott</u>, 83 F. Supp. 2d at 197). Therefore, there is a sufficient nexus to both the Gateway laptop and the Soto Family Residence, and thus prong two of the <u>Murray</u>/<u>Dessesaure</u> test is satisfied.[7]

Finding no clear error with the district court's conclusion that Agent Everett's decision to seek the 2007 warrants was not prompted by the illegal April 2006 search and concluding that there was a sufficient nexus to both the laptop and the Soto Family Residence, we hold that there was an independent source for the 2007 searches, and thus the evidence seized from the searches was admissible. Accordingly, the district court properly denied the Sotos' motion to suppress.

## B. Double Jeopardy

### 1. Relevant Background

During the third week of trial, Steven filed a pro se motion[8] to dismiss all of the charges against him. According to

_____

[7]  The government and district court also relied on the fact that 56 Lawrence Road was featured "as first prize for an unauthorized raffle." However, the raffle instructed purchasers to mail payments to the address for Paradise Real Estate, and not the Soto Family Residence, so it is unclear to us how this factor supports a nexus between the illegal schemes and 56 Lawrence Road.

[8]  Steven's counsel declined to sign the motion as counsel of record but agreed to present it to the district court on Steven's behalf.

Steven, the indictment violated the Fifth Amendment's Double Jeopardy Clause because the current charges all stemmed from the illegal use of the same identities -- Bradley and Espinal -- that formed the basis of the prior motorcycle and automobile charges (discussed above) he was ultimately convicted of. See generally United States v. Soto, 720 F.3d 51 (1st Cir. 2013) (reviewing his prior convictions). In essence, Steven argued that each count of identity theft and fraud was not an isolated event, but rather an ongoing conspiracy, and thus he was being twice prosecuted for the same crimes in violation of the Fifth Amendment.

The district court in its discretion opted not to officially consider Steven's pro se motion,[9] noting that pro se pleadings by represented defendants are disruptive and that the time for motions to dismiss had long since passed. Still, the district court explained that even if it were to consider Steven's pro se motion, the motion would fail for a number of reasons: (1) there was no good cause to excuse the requirement that double jeopardy motions be filed pretrial; (2) the motion lacked merit because the earlier case involved different defendants, different victims, and different evidence (though there was some evidentiary

---

[9] In United States v. Tracey, 989 F.2d 1279, 1285 (1st Cir. 1993), we explained that because a district court "enjoys wide latitude in managing its docket and can require represented parties to present motions through counsel," the district court did not abuse its discretion in refusing to consider the defendant's pro se motions.

-28-

overlap); and (3) there was no prejudice to Steven by his counsel's refusal to file the motion.

## 2. Steven Was Not Subject to Double Jeopardy

On appeal, Steven raises the same double jeopardy argument -- once again through a pro se filing. This claim lacks merit.[10] The Double Jeopardy Clause of the Fifth Amendment states that no person can "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; see also United States v. Feliz, 503 U.S. 378, 385 (1992) ("At its root, the Double Jeopardy Clause forbids the duplicative prosecution of a defendant for the 'same offence.'"). In deciding whether multiple prosecutions under the same statute violate the Due Process Clause, we look at whether the crimes were different in place and time, whether there was common conduct linking the alleged offenses,

---

[10] The government argues that this claim is waived because he did not raise his double jeopardy argument prior to trial. However, the government relies on a version of Rule 12 of the Federal Rules of Criminal Procedure (as well as caselaw interpreting that Rule) that has since been amended. The amended Rule 12 eliminated any reference to waiver, instead explaining that

> [i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause.

Fed. R. Crim. P. 12(c)(3). Indeed, the Advisory Committee Notes to the 2014 Amendments specifically state that "the Committee decided not to employ the term 'waiver'" because the initial rule was never intended to "require[] any determination that a party who failed to make a timely motion intended to relinquish a defense, objection, or request that was not raised in a timely fashion." Rule 12 adv. comm. notes to 2014 amend.

whether the individuals involved in each offense were different, and whether the evidence used to prove the offenses differed.  Id.; United States v. DeCologero, 530 F.3d 36, 71 (1st Cir. 2008); United States v. Chagra, 653 F.2d 26, 29 (1st Cir. 1981).

Here, there is little question that Steven's multiple fraud counts do not implicate double jeopardy.  Though he was charged with multiple counts of fraud under the same section, each count involved a different location -- 242 Main Street, 55 Lawrence Street, 399 Orange Street, and 21 Dudley Street in the current case and Motorcycles of Manchester, North Reading Motor Sports Inc., Kelly Motor Sports, and other car dealerships in his prior case. Moreover, each event occurred during a different time -- the frauds at issue in the present case occurred on different days between the fall of 2006 and the spring of 2007 while the motorcycle and automobile fraud began in March 2006.  Each fraudulent scheme also involved different participants -- the properties were owned by different individuals, the motorcycles and automobiles were owned by different vendors, and the mortgages were obtained from different lenders.  And while there was some overlap in evidence amongst the different fraudulent transactions, the evidence for each was far from identical.  See Felix, 503 U.S. at 386 ("[O]ur precedents hold that a mere overlap in proof between two prosecutions does not establish a double jeopardy violation."); Chagra, 653 F.2d at 29 (finding no double jeopardy violation where

the charged offenses occurred during different times, the participants were different, the places differed, and the evidence used to prove the offenses differed).

The same is true regarding each count of aggravated identity theft. Though Steven was charged with multiple counts of unlawfully using Bradley's and Espinal's identity, each count was tied to a different and distinct underlying felony -- the fraud related to the motorcycles and automobiles in the prior case and the mail fraud related to each property in the present case. As the Seventh Circuit explained in the context of an 18 U.S.C. § 924(c) gun possession case,

> [b]ecause the statute ties the gun possession charge to the underlying drug transaction, the unit of prosecution is each predicate offense in which a firearm is carried, used, or possessed with the intent to further the drug crime, as long as there is some meaningful difference in the conduct that led to each predicate offense. So in a case involving two drug offenses based on separate and distinct conduct, a defendant's carrying of a gun during each of them constitute[s] two violations of section 924(c).

United States v. Cejas, 761 F.3d 717, 731 (7th Cir. 2014) (alteration in original) (internal citations and quotation marks omitted). The same logic applies here. The aggravated identity theft statute makes it unlawful to "knowingly transfer[], possess[], or use[], without lawful authority, a means of identification of another person" "during and in relation to any enumerated felony violation enumerated in subsection (c)." 18

U.S.C. § 1028A(a)(1) (emphasis added). Mail, bank, and wire fraud are all enumerated felonies. See id. § 1028A(c)(5). Because each use of Bradley's and Espinal's identity was distinct and in furtherance of a different fraudulent scheme,[11] each use constitutes its own violation of § 1028A. Steven's convictions therefore do not stem from the same criminal conduct, and thus there is no double jeopardy concern.

## C. Shea's Comments

### 1. Relevant Testimony

One of the government witnesses was Shea, the owner of 55 Lawrence Street. She testified that Steven, pretending to be Bradley, attempted to obtain her signature on documents which would have allowed him to sell her property as three separate condominiums. Shea refused to sign the documents and also secretly recorded the conversation. This recording was played at trial, during which Steven was heard telling Shea that her refusal to sign could likely result in a federal investigation. Shea then responded to Steven that "[t]hey will find out the truth." When the prosecutor asked Shea to explain her comment, Shea testified

---

[11] Steven also seems to argue that these were not independent schemes, but rather one overarching conspiracy. Even if this were true -- something we need not decide -- his argument would still fail. "A substantive crime and a conspiracy to commit that crime are not the 'same offence' for double jeopardy purposes." Felix, 503 U.S. at 389; see also DeCologero, 530 F.3d at 71-72 (finding no double jeopardy violation in successive RICO prosecutions where the enterprise was the same but the pattern of racketeering activity was not); see also Cejas, 761 F.3d at 730-31.

that she felt Pedro and Steven "were tricking" her and that she had put her "trust in Pedro to sell [her] house" but that "they were trying to steal [her] house from [her] and sell it and keep the money for themselves."

During cross-examination, Steven's counsel asked whether Shea had spoken with John Briggs, an attorney, about the lease-with-option-to-purchase agreement with "Bradley." She avoided answering the question, instead testifying that Briggs had told her that Pedro was "not an honest person" and that it was because of this statement that she "refused to sign the paper." Steven's counsel asked Shea to listen to his specific question, but Shea again refused to respond, instead stating that she "do[es]n't trust him." The district court then instructed Shea to "[l]isten to the question. Say what is necessary to answer that question. Don't say anything else."

### 2.  Standard of Review

Pedro argues that this testimony contained inadmissible character evidence, hearsay, and lay opinions, in violation of Rules 404, 801, 802, and 701 of the Federal Rules of Evidence, respectively. He also contends that it was unduly prejudicial under Rule 403 of the Federal Rules of Evidence. Because Pedro never objected at trial, our review would ordinarily be for plain error. See United States v. Rodríguez-Adorno, 695 F.3d 32, 38 (1st Cir. 2012). However, Pedro claims that the objection was

nevertheless preserved -- and thus subject to abuse-of-discretion review -- because the district court <u>sua sponte</u> interjected, essentially objecting for Pedro.  This argument lacks merit.

Assuming without deciding that a party need not repeat an objection already noted and acted upon by a trial judge <u>sua sponte</u>, here nothing the trial judge said obviated the need to raise and preserve the different points Pedro now wishes to raise for the first time on appeal.  <u>See</u> Fed. R. Evid. 103(a); <u>United States</u> v. <u>Wallace</u>, 461 F.3d 15, 35 n.11 (1st Cir. 2006) ("Because that objection was on different grounds, however, we deem the defendant's present argument of error, raised for the first time on appeal, as unpreserved.").  Pedro alleges that the challenged statements were inadmissible because they contained character evidence, hearsay testimony, lay opinion testimony, and were unduly prejudicial.  The district court's interjection, however, had nothing to do with these claims of error.  Shea was refusing to answer Steven's counsel's question and was instead opting to opine on topics beyond the question's scope.  By instructing Shea to listen to what was being asked and only answer that question, the district court was simply attempting to keep Shea on topic; it was taking no views on whether Shea's beyond-the-scope comments would be inadmissible if relevant to the question asked.

Accordingly, our review is for plain error.  <u>Rodríguez-Adorno</u>, 695 F.3d at 38.  Under this review, we will only reverse if

"(1) an error occurred (2) which was clear or obvious and which not only (3) affected [] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id. (alteration in original) (internal quotation marks omitted).

### 3.  **There Was No Plain Error**

Pedro has failed to show that Shea's comments amount to plain error.  First, Shea's comments were not improper character evidence prohibited by Rule 404.  While the Rule does prohibit "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait," evidence of bad acts may be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, [or] knowledge."  Fed. R. Evid. 404(a),(b); see also United States v. Joubert, 778 F.3d 247, 254 (1st Cir. 2015) ("The rule prohibits the prosecution from introducing evidence that is extrinsic to the crime charged solely for the purpose of showing villainous propensity." (internal quotation marks omitted)); United States v. George, 761 F.3d 42, 58 (1st Cir. 2014) (finding a recording discussing other bad acts admissible because it painted a picture of the witness's and defendant's relationship).  Shea's comments were not made to establish that Pedro was a dishonest trickster trying to steal her house, but rather were made to explain her reasons for telling

Steven "[t]hey will find out the truth" and for refusing to sign the documents to convert her property into condominiums.  Thus, the statements served an important non-propensity purpose -- namely Shea's explanation and motivations for acting the way she did -- and were not improper character evidence.

For similar reasons, Shea's statement that Briggs told her Pedro was "not an honest person," is not improper hearsay testimony.  For evidence to be hearsay, and thus inadmissible under Rule 802 of the Federal Rules of Evidence, the evidence must be "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  United States v. Cruz-Díaz, 550 F.3d 169, 176 (1st Cir. 2008) (internal quotation marks omitted); see also Fed. R. Evid. 801(c).  While Briggs's comment was an out-of-court statement, it was offered to explain Shea's rationale for refusing to sign the documents presented by Steven -- and not to prove Pedro's dishonesty.  Accordingly, it was not hearsay.  See Cruz-Díaz, 550 F.3d at 176 ("Out-of-court statements offered not to prove the truth of the matter asserted but merely to show context -- such as a statement offered for the limited purpose of showing what effect the statement had on the listener -- are not hearsay.").

We also disagree with Pedro's contention that Shea's comments that Pedro was "tricking" her and "trying to steal" her

house and "keep the money for themselves" was improper opinion testimony.  A lay witness may testify as to her opinion if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge . . . ." Fed. R. Evid. 701.  Shea's testimony stemmed from her perception of what the Sotos were doing, it was helpful to explain why the Sotos might be trying to split and sell the property as three condominiums without Shea's involvement or consent, and it involved no special or technical knowledge.  We therefore think that this testimony is on the acceptable side of what is admissible, but even if it did cross the line, it did so ever-so-slightly, and thus is in no way a "clear" or "obvious" error establishing plain error.  See Rodríguez-Adorno, 695 F.3d at 38.

Not to be deterred, Pedro argues that regardless of its admissibility, the evidence should still have been excluded under Rule 403, which allows a district court to exclude otherwise admissible evidence "if its probative value is substantially outweighed by 'the danger of unfair prejudice.'" United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000) (quoting Fed. R. Evid. 403).  "Unfair prejudice," however, is reserved for "evidence that invites the jury to render a verdict on an improper emotional basis" or for evidence that is "shocking or heinous" and "likely to

-37-

inflame the jury."  Id. at 122 (internal quotation marks and citations omitted).  Nothing that Shea testified to rises to this level.

Accordingly, the admission of Shea's testimony was not plain error.

**D.  The GAO Report**

### 1.  Relevant Background

Carmen and Steven pursued a "condonation" -- or good faith -- defense, arguing that they lacked the intent to defraud because the mortgage lenders were aware of and tacitly approved of the Sotos' conduct.[12]  According to the Sotos, because mortgage lenders were so focused on making as many loans as possible which they could then turn around and resell into securitizations, underwriting standards were lax and the lenders were not interested in what information the borrower provided or even if the loan would default.  Carmen and Steven made this argument mostly through cross-examination of government witnesses, though the Sotos also tried to introduce a report from the Government Accountability Office ("GAO") which concluded that

> [t]he role of nonbank mortgage lenders in the recent financial collapse provides an example of a gap in our financial regulatory system resulting from activities of institutions that were generally subject to little or no direct oversight by federal regulators.  The

_____

[12]  Pedro's defense, meanwhile, contended that all of the closings were legitimate.

significant participation by these nonbank lenders in the subprime market -- which targeted products with riskier features to borrowers with limited or poor credit history -- contributed to a dramatic loosening in underwriting standards leading up to the crisis.

(footnote omitted). According to the Sotos, the GAO Report "encapsulate[d] the entire defense" and was probative "on the issue of what the climate was during this period of time." The district court disagreed, excluding the report under Rule 403 of the Federal Rules of Evidence. According to the district court,

> The GAO report says nothing about the particular lenders in this case, it only, in the proffered excerpt, mentions a "dramatic loosening of underwriting standards." That's a general observation. The report, as I said yesterday, as a whole focuses on the need for better federal regulation.
>
> Assuming without finding that the GAO report is a public record admissible under Rule 803[8], I find that Rule 403 operates to exclude it. It has little, if any, probative value with regard to the particular lenders involved in this case. The defendants have evidence that one lender knew that Landess was not moving into the property at issue. So it's my present intention to give a [condonation] instruction. And the excerpt wouldn't be sufficient to get the instruction if the evidence were otherwise insufficient.
>
> I find that any probative value of the GAO report is substantially outweighed by the risk of confusion of the issues and the risk that its admission would cause the jury not to understand or follow the proper [condonation] instruction I intend to give and would therefore be unfairly prejudicial. I also find that it has no probative value with regard to materiality, which is an objective

test, and the analysis is essentially the same.

## 2.  The District Court Did Not Abuse Its Discretion

The Sotos all claim that this report was improperly excluded under Rule 403.  We disagree.  As discussed above, Rule 403 of the Federal Rules of Evidence allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  This "balancing act . . . is a quintessentially fact-sensitive enterprise" which the district court is in the best position to make.  Joubert, 778 F.3d at 255.  Accordingly, we review for abuse of discretion,[13] keeping in mind that "[o]nly rarely and in extraordinary compelling circumstances will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect."  United States v. Vizcarrondo-Casanova, 763 F.3d 89, 94 (1st Cir. 2014) (alteration in original) (internal quotation marks omitted); see also United States v. Cruz-Feliciano, 786 F.3d 78, 88 (1st Cir. 2015).

---

[13]  While Carmen objected to the exclusion of the GAO report at trial -- thus entitling her to abuse-of-discretion review -- Pedro and Steven failed to join Carmen's objection.  We need not decide whether Carmen's objection preserved the issue for Pedro and Steven, however, because the argument fails regardless of the standard of review.

Here, the Sotos wanted to introduce a nine-page excerpt from a GAO report that discussed, very broadly, the need for tighter federal regulation of mortgage lenders. As part of this analysis, the report noted the trend of loosening underwriting standards in an attempt for lenders to issue, and in turn sell and securitize, more mortgages. But as the district court correctly noted, the fact that lenders were loosening their standards and issuing riskier mortgages is a far cry from saying that the lenders did not care about a borrower's risk profile or that they condoned (and actually encouraged) loan applicants to lie on applications. The GAO report does not make this leap, and even if it had, the report only speaks broadly about national trends; nothing in the report connects these trends to the specific lenders defrauded here. Thus, we agree with the district court that the probative value of the report was minimal. See United States v. Tetioukhine, 725 F.3d 1, 8 (1st Cir. 2013) (upholding the district court's exclusion of expert testimony on Russian culture under Rule 403 because Russian culture is a broad topic and the intended testimony that the citizens of the Soviet Union perceived America as "a free country" would be both vague and unhelpful); Banco Popular de P.R. v. ACEMLA, 678 F.3d 102, 112 (1st Cir. 2012) (affirming the district court's exclusion of a series of judgments because none of the judgments concerned the four songs that were at issue in the

copyright infringement case); <u>United States</u> v. <u>Josleyn</u>, 206 F.3d 144, 148 (1st Cir. 2000).

On the flip side, the district court concluded that the risk of prejudice was high because the GAO report could confuse the jury when the district court instructed it on condonation. Given that the condonation defense requires condonation by the specific party aggrieved and the GAO report only speaks in broad, national terms, it was entirely reasonable for the district court to worry that the admission of the GAO report would improperly influence the jury's understanding of the lending practices of the actual lenders defrauded by the Sotos. <u>See</u> <u>Banco Popular</u>, 678 F.3d at 112 (affirming the exclusion of judgments because "mentioning these rulings by name and in detail could give the jury a misimpression of the evidence before it").

The district court found that the GAO report had minimal probative value while at the same time created a high risk that the jury could confuse or misunderstand the condonation defense. We see nothing "extraordinarily compelling" with this case which would require us to second-guess the district court's conclusions and re-balance each consideration. The district court did not abuse its discretion, and thus we affirm the exclusion of the GAO report.

**E. The Sufficiency of the Evidence**

Steven argues through his supplemental pro se brief that the district court erred in denying the Sotos' joint Rule 29 motion

for judgment of acquittal.  According to Steven, the government failed to provide sufficient evidence proving the "mailing element" of the mail fraud charges.  We review this claim de novo, United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012), and reject it.

The crime of mail fraud includes three elements:  "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail . . . communications in furtherance of that scheme."  United States v. Hebshie, 549 F.3d 30, 35 (1st Cir. 2008) (alteration in original) (internal quotation marks omitted).

This last element, known as the "mailing element," has two parts.  First, the defendant must "cause the use of the mails, which includes reasonably foreseeable mailings."  Id. at 36 (emphasis in original).  "It is not necessary to prove that the defendant personally executed the mailings, but merely that the defendant 'caused the mailing by doing some act from which it is reasonably foreseeable that the mails will be used.'"  United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004) (quoting United States v. Bruckman, 874 F.2d 57, 60 (1st Cir. 1989)).  This includes knowing (or at least reasonably foreseeing) that the mail is often used in the ordinary course of business.  Id.

Second, the defendant must "use the mails _for the purpose_, or _in furtherance_, of executing the scheme to defraud." Hebshie, 549 F.3d at 36 (emphasis in original). This requirement "is to be broadly read and applied." Id.; see also United States v. Pacheco-Ortiz, 889 F.2d 301, 305 (1st Cir. 1989) (explaining that this language "has been given a 'liberal construction' by this court and others"). "To further [a defendant's] fraudulent scheme, the mailings need not be an essential element of the scheme. They simply must be sufficiently closely related to the scheme such that they are incident to an essential part of the scheme or a step in the plot." Hebshie, 549 F.3d at 36 (alteration, internal citations, and internal quotation marks omitted). So long as there is a "connection or relationship" between the mailing and the fraudulent scheme and the mailing was "part of the execution of the scheme as conceived by the perpetrator at the time," the "in furtherance" prong is satisfied. Id.

In reviewing Steven's claim that the evidence was insufficient to establish the "mailing element," we look to see "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." Id. at 35 (internal quotation marks omitted); see also United States v. Royal, 100 F.3d 1019, 1028 (1st Cir. 1996). We

have undertaken this process and conclude that the government clearly provided sufficient evidence to satisfy the mailing element.

The Sotos' scheme essentially consisted of sham real estate transactions conducted in order to procure fraudulent loans which would then default. For each of the four properties at issue, the government presented witnesses who testified that the closing documents (which were also introduced into evidence) instructed the lenders' attorney to send the executed closing documents to the lenders' physical address. The witnesses also testified that, as instructed, they mailed those documents -- either through FedEx, UPS, or the United States Postal Service[14] -- to the lender per their usual course of business. Though none of the Sotos personally mailed anything, they arranged for all the transactions to occur and signed all the necessary documents. Given the documents' instructions to mail the closing documents, the witnesses' testimony that they did in fact mail the documents, and the Sotos' participation in the real estate market (both through these schemes and their legitimate real estate brokerage firm Paradise Real Estate) whereby closing documents are mailed as part of the ordinary course of business, there is little question

---

[14] It makes no difference whether the lender used the United States Postal Service or a private carrier. The mail fraud statute applies to items "sent or delivered by the Postal Service, or . . . sent or delivered by any private or commercial interstate carrier." 18 U.S.C. § 1341.

that the jury could conclude that the Sotos knew -- or at the very least foresaw -- that a mailing that would not otherwise have occurred would occur precisely because of the manner in which the Sotos sought to complete their fraud.  See Pimental, 380 F.3d at 584; Royal, 100 F.3d at 1019 (finding that it was reasonable for jury to conclude that it was foreseeable that mails would be utilized where "in the ordinary course of business, admissions and federal student financial aid applications . . . would be sent . . . . through the mails"); United States v. Contenti, 735 F.2d 628, 631 (1st Cir. 1984).  Contrary to Steven's suggestion, it was not necessary for the government to have submitted records from FedEx, UPS, and the United States Postal Service confirming the mailings.  While this is certainly one way the government could have proven the point, its decision to instead call the witnesses who participated in the closings and mailings is just as effective.  Thus, the first prong of the mailing element -- that the Sotos caused the use of the mails -- was satisfied.

     The same is true for the "in furtherance" prong.  Given the broad interpretation of "in furtherance," the mailings were clearly a "step in the plot" necessary to execute the scheme.  Hebshie, 549 F.3d at 36.  The closings could not be completed -- and thus the fraudulent loans could not be processed and disbursed -- until the lender received the executed documents.  We have held on numerous occasions that the transmission of executed documents

is sufficient to satisfy the "in furtherance" requirement of mail fraud, and this is just another such example.  See, e.g., id. ("Courts have generally held that mailings sent in connection with insurance claims further an insurance fraud scheme."); Royal, 100 F.3d at 1029-30 (holding that mail fraud was established where documents containing misstated or fraudulent information for student loans were sent via mail); Contenti, 735 F.2d at 632 (finding that proof of loss sent to insurance broker furthered the scheme); United States v. Martin, 694 F.2d 885, 890 (1st Cir. 1982) (holding that the mailing of falsified insurance applications "were an integral part of appellant's ongoing scheme to defraud" and thus satisfy the "in furtherance" requirement).

Accordingly, both requirements of the mail fraud statute's "mailing element" were satisfied, and thus there was sufficient evidence to sustain the convictions.  The Sotos' joint Rule 29 motion was properly denied.

## F.  Jury Instructions

### 1.  Relevant Background

In support of their condonation defense, Steven and Carmen requested that the district court instruct the jury on both good faith and condonation.  After concluding that they had presented sufficient evidence by which a jury could accept this theory, the district court agreed to provide the instructions.  At the charge conference held on June 19, 2013 -- the day before

closing arguments -- the district court previewed its instructions. With regard to good faith and condonation, the instruction read as follows:

> To act with intent to defraud means to act with intent to deceive someone in order to obtain money or property. Since an essential element of the crime charged is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of mail fraud.
>
> . . . .
>
> A defendant, however, has no burden to establish his or her good faith . . . . Rather, the burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt. . . .
>
> In considering whether or not a defendant acted in good faith, you are instructed that any belief by a defendant that ultimately everything would work out so that no one would lose any money does not require a finding by you that he or she acted in good faith. No amount of honest belief on the part of the defendant that the alleged scheme would ultimately benefit the people and/or institutions involved will excuse fraudulent actions or false representations and material -- false representations by a defendant to obtain money.
>
> In this case the defendants argue that the mortgage lenders each knew and condone, that is, gave tacit approval to the conduct in which defendants are alleged to have engaged. The mortgage lenders' knowledge or tacit approval of the commission of an offense does not by itself constitute a defense or an excuse for the crime of mail fraud. However, any evidence that a mortgage lender knew of the allegedly fraudulent scheme or of an alleged material false statement and nevertheless granted a requested loan, may be

considered by you on the issue of whether the government has proven that a defendant had the intent to defraud necessary to have committed the alleged mail fraud at issue. Each defendant contends that each of the mortgage lenders involved in this case knew of and condoned the activities in question and therefore that he or she did not possess the required intent to commit the crimes of mail fraud with which he or she is charged. The defendant has no duty to prove to you that this contention is correct, rather the burden is always on the government to prove each element of each offense charged beyond a reasonable doubt, including the element of intent.

After previewing the instruction, the district court asked the parties if "there [was] any reaction to that instruction?" Carmen's counsel stated "[n]ot from me," while Steven's and Pedro's counsels remained silent. The court acknowledged that the instruction was not word-for-word what the Sotos had requested but still felt it was "essentially what [they] were] looking for." The district court then gave the parties one last opportunity to object, and when nobody did, the district court moved on.

The following day, the district court instructed the jury in line with these instructions. It also gave a lengthy instruction on reasonable doubt:

As you've heard me say repeatedly, the burden is on the government to prove beyond a reasonable doubt a defendant is guilty of the charge made against him or made against her. The burden of proof has nothing to do with who called witnesses or the number of exhibits, one side or the other, introduced[;] it has to

do with the quality of the evidence. Proof beyond a reasonable doubt is a strict and heavy burden, but it does not mean that a defendant's guilt must be proved beyond all possible doubt. It does require that the evidence exclude any reasonable doubt concerning a defendant's guilt.

A reasonable doubt may arise not only from the evidence produced, but also from the lack of evidence produced by the government. Reasonable doubt exists when, after weighing and considering all the evidence, using reason and common sense, jurors cannot say that they have a settled conviction of the truth of the charge.

Of course a defendant is never to be convicted on suspicion or guesswork. If, for example, you view the evidence in the case as reasonably permitting either of two conclusions, one that a defendant is guilty as charged, the other that the defendant was not guilty, you will find the defendant not guilty. It is not sufficient for the government to establish a probability, though a strong one, that an element of an offense charged, a fact necessary to prove an offense charged, is more likely to be true than not true. That is not enough to meet the burden of proof beyond a reasonable doubt. On the other hand, there are very few things in this world that we know with absolute certainty and in criminal cases the law does not require proof that overcomes every possible doubt.

So concluding my instructions on the burden then, I instruct you that what the government must do to meet its heavy burden is to establish the truth of each part of each offense charged by proof that convinces you and leaves you with no reasonable doubt and therefore satisfies you that you can, consistent with your oath as jurors, base your verdict upon it. If you find that a particular charge against a defendant has been proven beyond a reasonable doubt, you will return a verdict of guilty on that charge. If

on the other hand you think there is a reasonable doubt about whether a defendant is guilty of a particular offense, you must give the defendant the benefit of that doubt and find the defendant not guilty of that offense.

None of the Sotos objected to these instructions. In fact, Steven and Carmen both referred to the district court's good faith and condonation instruction during their closing arguments.

### 2. The Sotos Waived any Challenge to the Good Faith/Condonation Instruction

Each member of the Soto Family alleges that the district court's good faith/condonation instruction was flawed. Specifically, Steven and Carmen claim that the no ultimate harm instruction -- that an honest belief that "ultimately everything would work out" or that "no one would lose money" does not on its own excuse fraudulent behavior and material false representations -- mischaracterized the law and allowed the jury to convict even if it concluded the Sotos acted in good faith. Pedro, meanwhile, argues that because he did not pursue a condonation defense, the district court should have emphasized that those instructions did not apply to him.

We do not reach the merits of these arguments because, as the government correctly points out, the Sotos have waived any claim of error. Though a party's failure to object usually results in a forfeiture subject to plain-error review, when the "subject matter [is] unmistakably on the table, and the defense's silence is reasonably understood only as signifying agreement that there was

-51-

nothing objectionable," the issue is waived on appeal. <u>United States</u> v. <u>Christi</u>, 682 F.3d 138, 142 (1st Cir. 2012); <u>see also</u> <u>United States</u> v. <u>Medina</u>, 427 F.3d 88, 91 (1st Cir. 2005) ("A party's considered decision not to avail itself of a procedural right, evidenced here by counsel's persistent and reasoned refusal of the judge's suggestions [to object or request a cautionary instruction], waives that right.").

Here, the district court informed the Sotos exactly how it was planning to instruct the jury on good faith and condonation -- instructions Carmen and Steven had explicitly requested -- and sought their feedback, twice asking if they were okay with those specific instructions. Carmen's counsel affirmatively stated there was no objection, while Steven's and Pedro's counsels remained silent. Given the judge's invitation to speak up with any disagreement, these reactions can only be interpreted as signifying approval with the instructions as previewed (and ultimately relayed to the jury). Accordingly, the Sotos' current claims of the instructions' inadequacy are waived.

### 3. **The Reasonable Doubt Instruction Was Not Erroneous**

Pedro also challenges the district court's reasonable doubt instruction, arguing that the "two inference" portion of the instruction is disfavored both in this circuit and nationwide. Our

review is for plain error since Pedro never objected at trial,[15] but under any standard of review his argument fails.  See United States v. LaPlante, 714 F.3d 641, 643 (1st Cir. 2013).  In United States v. Cleveland, we approved of a reasonable doubt instruction substantively identical to the one given by the district court here, explaining that the instruction "correctly conveyed the concept of reasonable doubt to the jury."  106 F.3d 1056, 1062-63 (1st Cir. 1997), abrogated on different grounds by Brache v. United States, 165 F.3d 99 (1st Cir. 1999).  We agree with that conclusion and see no reason to find differently here.  Like the instruction given in Cleveland, "there was no 'reasonable likelihood' that the jury misunderstood the government's burden."  United States v. Ranney, 298 F.3d 74, 80 (1st Cir. 2002); see also Víctor v.

---

[15]  Unlike with the good faith/condonation instruction, there is no evidence in the record that the district court discussed this instruction with the parties and Pedro remained silent when given the opportunity to comment on it.  Thus, there is no waiver issue. Cf. Rojo-Álvarez, 944 F.2d at 971.

Nebraska, 511 U.S. 1, 6 (1994).[16]  The instruction, therefore, was proper.

We also reject Pedro's argument that the reasonable doubt instruction increased the prejudice attendant to the no ultimate harm instruction.  Pedro provides no argument as to how or why the instruction increased prejudice, and we fail to see it either.  Thus, even if the intersection of these two instructions did somehow prejudice Pedro, any error would not have been "clear" or "obvious" as needed to satisfy plain-error review.  See LaPlante, 714 F.3d at 643 ("To establish plain error, a defendant must show that . . . the error was obvious . . . .").

## G.  Carmen's Restitution

Finally, Carmen challenges the portion of her sentence requiring her to pay $792,559 in restitution.  According to Carmen, because the losses stemmed not only from her conduct but also from the lenders' own greed and market practices at the time, her

---

[16]  Pedro is correct that we have cautioned against the isolated use of the "two inference" instruction without more.  However, this concern stemmed from the comparison between "guilt" and "innocence."  See United States v. Andújar, 49 F.3d 16, 24 (1st Cir. 1995) ("We have previously warned district courts against using a 'guilt or innocence' comparison" because it suggests that the jury "should find the defendant guilty if they think he is not innocent -- regardless of how convincing the government's proof has been.").  When the comparison is between "guilty" and "not guilty," like it is here, we have found the instruction to be "less troublesome."  Ranney, 298 F.3d at 79; see also United States v. O'Shea, 426 F.3d 475, 483 (1st Cir. 2005).  And in any event, the "two inference" language was not given in a vacuum, but rather in a lengthy, detailed, and proper explanation of reasonable doubt.

actions did not proximately cause the entire loss, and thus the restitution order is too high. "[W]e review an order of restitution for abuse of discretion, and findings of fact subsidiary to the order for clear error."[17] United States v. Innarelli, 524 F.3d 286, 293 (1st Cir. 2008). Legal conclusions related to the order, meanwhile, are reviewed de novo. Id.

The Mandatory Victims Restitution Act of 1996 ("MVRA") mandates that a district court order a defendant convicted of fraud to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). When, like here, the "return of the property lost by the victim is 'impossible, impracticable, or inadequate,' the offender must pay the victim 'an amount equal to . . . the value of the property' less 'the value (as of the date the property is returned) of any part of the property that is returned.'" Robers v. United States, 134 S. Ct. 1854, 1856 (2014)

---

[17] The government contends that Carmen never interposed a specific objection and thus our review should be for plain error. At sentencing, Carmen's counsel asked to be heard on the restitution issue and then stated that

> these restitution orders are substantial and they're for the full amount of the loss, but in imposing your sentence you were essentially giving the defendant some credit in terms of time for the market, for what I think you referred to as the "market practice at the time."

He then proceeded to add that he was "concerned by that apparent--" but was unable to finish because the district court cut him off in order to explain why it believed the restitution order was correct. We need not resolve whether this was sufficient to preserve the issue for appeal because Carmen's argument falls short under any standard of review.

(quoting 18 U.S.C. § 3663A(b)(1)(B)).  The term "any part of the property" refers to "the money lent."  Id.

Carmen does not dispute that the district court properly calculated the loss value for the five fraudulent loans (the two units at 55 Lawrence Street and the three at 21 Dudley Street) at $792,559.[18]  Instead, she contends that the district court erred in finding her responsible for the entirety of that loss due to the MVRA's proximate cause requirement.  See 18 U.S.C. § 3663A(a)(2); Robers, 134 S. Ct. at 1859.  Though Carmen is correct that the MVRA has a proximate cause requirement, she misunderstands its meaning and application.  Proximate cause asks "whether the harm alleged has a sufficiently close connection to the conduct at issue." Robers, 134 S. Ct. at 1859 (internal quotation marks omitted).  In other words, was the harm foreseeable?  See Paroline v. United States, 134 S. Ct. 1710, 1719 (2014) ("Proximate cause is often explicated in terms of foresseability or the scope of the risk created by the predicate conduct.").

There is no requirement that there only be one proximate cause.  To the contrary, "it is common for injuries to have multiple proximate causes."  Staub v. Proctor Hosp., 562 U.S. 411, 420 (2011); see also United States v. Kearney, 672 F.3d 81, 98 (1st Cir. 2012) ("Proximate cause exists where the tortious conduct of

---

[18]  The loans totaled $995,000 but the lenders recouped $202,441 after foreclosure sales.

multiple actors has combined to bring about harm, even if the harm suffered by the [victim] might be the same if one of the numerous tortfeasors had not committed the tort."). That the lenders' own greed and market practices at the time may have contributed to the loss has nothing to do with whether the entire loss amount was foreseeable to Carmen. And given Carmen's in-depth knowledge of the real estate market and these market practices (which Carmen admitted to taking advantage of), the district court's factual determination that the entire loss was foreseeable to her was not clearly erroneous. See Robers, 134 S. Ct. at 1859 ("Fluctuations in property values are common. Their existence (though not direction or amount) is foreseeable. And losses in part incurred through a decline in the value of collateral sold are directly related to an offender's having obtained collateralized property through fraud.").

Similarly, it is irrelevant to the restitution order that the district court opted to vary Carmen's sentence downward in part due to the lenders' greed and the current market conditions. The purpose of Carmen's prison sentence is to punish Carmen for her actions, while the purpose of restitution is to make the victim whole. See Innarelli, 524 F.3d at 293 ("Unlike the calculation of loss amount in sentencing, the purpose of restitution is not to punish the defendant, but to make the victim whole again by restoring to it the value of the losses it suffered as a result of

the defendant's crime."). Moreover, the district court's decision that the lenders' actions facilitated Carmen's crimes, and therefore Carmen deserved to spend less time incarcerated than the Guidelines recommended, is a discretionary determination based on the circumstances. The amount needed to make the lenders whole, meanwhile, is a set calculation mandated by statute. <u>Compare</u> <u>United States</u> v. <u>Gallardo-Ortiz</u>, 666 F.3d 808, 811 (1st Cir. 2012) (explaining that a sentencing court has wide discretion in imposing a variant sentence), <u>with</u> 18 U.S.C. § 3663A(a)(1) ("[T]he court shall order . . . that the defendant make restitution to the victim of the offense . . . .").

The district court, therefore, did not abuse its discretion in ordering Carmen to pay $792,559 in restitution.

### III.  <u>Conclusion</u>

For the foregoing reasons, the convictions of Steven, Carmen, and Pedro Soto all stand, as does the restitution order against Carmen.

**<u>Affirmed</u>**.